680 A.2d 480

**NORTH RIVER INSURANCE COMPANY and United States Fire Insurance Company et al.**

v.

**MAYOR AND CITY COUNCIL OF BALTIMORE.**

No. 98, Sept. Term, 1995.

Court of Appeals of Maryland.

Aug. 1, 1996.

---

Benjamin R. Civiletti (G. Stewart Webb, Jr., Mitchell Y. Mirviss, Kevin B. Collins, Venable, Baetjer and Howard, L.L.P., Jervis S. Finney, Warren B. Daly, Jr., Ober, Kaler, Grimes & Shriver, on brief), Baltimore, McElroy, Deutsch & Mulvaney (Lawrence F. McHeffey, Pamela A. Tanis), Morristown, NJ, for appellants.

Melvin J. Sykes (Carl E. Tuerk, Jr., Cooper, Beckman & Tuerk, L.L.P., Neal M. Janey, City Solicitor, Otho M. Thompson, Deputy City Solicitor, Baltimore, on brief), Stanley J. Levy, Jordan C. Fox, Levy, Phillips & Konigsberg, L.L.P., on brief, New York City, for appellee.

Laura A. Foggan, Keith S. Watson, Christine E. Connelly, Elizabeth A. Eastwood, Robert E. Johnston, Wiley, Rein & Fielding, Washington, amicus curiae for Ins. Environmental Litigation Ass'n.

Argued before ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL, RAKER and JOHN F. McAULIFFE (retired, specially assigned), JJ.

RODOWSKY, Judge.

Presented here are appeals from judgments entered as sanctions for discovery violations in a sequel to *United States Gypsum Co. v. Mayor & City Council of Baltimore*, 336 Md. 145, 647 A.2d 405 (1994). There we affirmed, *inter alia*, a judgment of the Circuit Court for Baltimore City in favor of Mayor and City Council of Baltimore (the City) for compensatory damages against Asbestospray Corp. in the amount of $8,333,183.81. *Id.* at 153, 647 A.2d at 408. Asbestospray was a manufacturer/distributor of asbestos-containing surface treatment products. *Id.* at 152, 647 A.2d at 408.

> "The greatest part of the compensatory damages award against Asbestospray represented $8,016,442.33 in costs to the City associated with rectifying the effects of and the complete removal of approximately 350,000 square feet of Asbestospray's fireproofing from Walbrook Senior High School. The asbestos fireproofing in Walbrook Senior High School had deteriorated, and had contaminated furniture, equipment and books in the school."

*Id.* at 155, 647 A.2d at 409.

In an effort to collect its judgment, the City caused writs of garnishment to be served on two liability insurers whose policies, the City contended, covered Asbestospray's loss. The insurers denied coverage, the parties undertook discovery, discovery disputes developed, and the circuit court entered, as a discovery sanction, a default judgment against the garnishees for $10,351,412.44, representing the full amount of the judgment of the City against Asbestospray, together with interest. The circuit court further entered judgment against both the garnishees and their attorneys for the City's attorneys' fees of $335,981.66. The aggrieved parties appealed, and this Court, on its own motion, issued the writ of certiorari prior to consideration of the matter by the Court of Special Appeals.

The garnishees are North River Insurance Company (North River) and United States Fire Insurance Company (USFI). They have business offices in the Morristown area of New Jersey. Garnishees were represented by: McElroy, Deutsch & Mulvaney, a Morristown-based law firm; by Lawrence F. McHeffey and Pamela A. Tanis (Tanis), a partner and associate respectively in the McElroy firm; by Ober, Kaler, Grimes & Shriver (OKG & S), a Baltimore-based law firm; and by Jervis S. Finney (Finney) and Warren B. Daly, Jr. (Daly), partners in OKG & S. Garnishees and all of their counsel are appellants. Approximately thirteen months after the garnishment was instituted, OKG & S replaced local counsel initially engaged by the garnishees. Counsel for the City, in addition to the City Solicitor, were Jordan C. Fox (Fox) of the New York City-based firm of Levy, Phillips & Konigsberg, L.L.P. and Carl E. Tuerk, Jr. (Tuerk) of the Baltimore-based firm of Cooper, Beckman & Tuerk, L.L.P. Neither of the attorneys who argued in this Court participated in the garnishment proceedings.

*United States Gypsum v. Baltimore* and its spin-off proceedings were complex litigation, administratively assigned to a single judge. All proceedings were conducted before Judge Joseph I. Pines, a retired judge of the Circuit Court for Baltimore City, acting pursuant to Article IV, § 3A of the Maryland Constitution.

On their legal merits the garnishment proceedings present insurance coverage issues. In Maryland, insurance contracts are interpreted as are other contracts. *Chantel Assocs. v. Mount Vernon Fire Ins. Co.*, 338 Md. 131, 142, 656 A.2d 779, 785 (1995); *Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). The general Maryland rule for the construction of insurance contracts is

"that the intention of the parties is to be ascertained if reasonably possible from the policy as a whole. In the event of an ambiguity, however, extrinsic evidence may be considered. If no extrinsic or parol evidence is introduced,

or if the ambiguity remains after consideration of the extrinsic or parol evidence ... it will be construed against the insurer as the drafter of the instrument."

*Cheney v. Bell Nat'l Life Ins. Co.,* 315 Md. 761, 766–67, 556 A.2d 1135, 1138 (1989). " 'A word's ordinary signification is tested by what meaning a reasonably prudent layperson would attach to the term.' " *Sullins v. Allstate Ins. Co.,* 340 Md. 503, 508, 667 A.2d 617, 619 (1995) (quoting *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.,* 330 Md. 758, 779, 625 A.2d 1021, 1031 (1993)). The foregoing rules have also been stated in: *Collier v. MD–Individual Practice Ass'n,* 327 Md. 1, 607 A.2d 537 (1992); *Valliere v. Allstate Ins. Co.,* 324 Md. 139, 596 A.2d 636 (1991); *Lloyd E. Mitchell, Inc. v. Maryland Casualty Co.,* 324 Md. 44, 595 A.2d 469 (1991); *Finci v. American Casualty Co.,* 323 Md. 358, 593 A.2d 1069 (1991); *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 578 A.2d 1202 (1990); *St. Paul Fire & Marine Ins. Co. v. House,* 315 Md. 328, 554 A.2d 404 (1989); and *Mutual Fire, Marine & Inland Ins. Co. v. Vollmer,* 306 Md. 243, 508 A.2d 130 (1986).

In the circuit court the City's position was that its garnishment reached credits under three policies, a primary policy and two commercial, comprehensive, catastrophe-liability policies. The primary policy was North River No. GLA 30–50–14 for the period 10/9/73 to 10/9/74 with a property damage limit of $100,000. During the pendency of the subject garnishment proceedings an interpleader action was filed in Ohio in which claims against this primary policy would be determined. That policy is nevertheless relevant to the instant matter, under the City's submission, because it contains a standard pollution exclusion which was found to be ambiguous in *United States Fidelity & Guar. Co. v. Wilkin Insulation Co.,* 144 Ill.2d 64, 161 Ill.Dec. 280, 578 N.E.2d 926 (1991), *aff'g* 193 Ill.App.3d 1087, 140 Ill.Dec. 907, 550 N.E.2d 1032 (1989). Ambiguity of the primary policy, argues the City, further reinforces its discovery rights.

The other two policies are described by garnishees as "umbrella" policies, and they were the principal objectives of the garnishments. The City contends that its attachment

reached credits under (1) USFI umbrella policy No. DGL 92–45–46 issued to Asbestospray and originally covering the three years from 9/7/71 to 9/7/74 with a combined limit of $5,000,000 per year and (2) North River umbrella policy No. DCL 00–69–40 issued for a term of three years from 9/7/73 to 9/7/76 to Spraycraft, Inc. with a combined limit of $5,000,000 per year. The City contends that Spraycraft is liable to it as a successor in interest to Asbestospray. We shall refer to these insureds, collectively, as "Asbestospray."

Both umbrella policies contain substantially the same "Contamination and Pollution" exclusion. In the North River umbrella policy that exclusion reads as follows:

"It is agreed this policy shall not apply to liability for contamination or pollution of land, water, air or real or personal property or any injuries or damages resulting therefrom caused by an occurrence.

"It is further agreed that for the purpose of this endorsement 'Occurrence' means a continuous or repeated exposure to conditions which unexpectedly and unintentionally causes injury to persons or tangible property during the policy period. All damages arising out of such exposure to substantially the same general conditions shall be considered as arising out of one occurrence."

The contamination and pollution exclusion in the umbrella policies is a non-standard exclusion, in the sense that it was not prepared by any industry-wide service organization; rather, the exclusion originated sometime and somewhere within the Crum & Forster group of companies with which North River and USFI are affiliated.

A principal contention of the garnishees on the merits of the garnishments is that the contamination and pollution exclusion in the umbrella policies unambiguously prevents coverage for Asbestospray's loss. Garnishees' position is supported by *Board of Regents of the Univ. of Minnesota v. Royal Ins. Co. of Am.*, 517 N.W.2d 888, 894 (Minn.1994) ("The common sense view, we think, is that the 'occurrence' causing the pollution damage is the continuous or repeated exposure of the build-

ing's interior to the gradual release of the asbestos fibers."), and by the unreported opinion in *University of South Carolina v. Royal Ins. Co. of Am.*, C/A No. 3:90–2856–17 (D.S.C. Mar. 21, 1994).

The City's position on the merits is that the terms "contamination" and "pollution" are ambiguous when the exclusion relating thereto is applied to the facts underlying the judgment against Asbestospray. The City cites *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995), where we held that application of the terms, "contaminants" and "pollutants," to lead paint is ambiguous under an exclusion for

"bodily injury which results in any manner from the discharge, dispersal, release, or escape of:

"a) vapors, fumes, acids, toxic chemicals, toxic liquids or toxic gases;

"b) waste materials or other irritants, contaminants or pollutants."

*Id.* at 506, 667 A.2d at 618. The City also points to an internal memorandum, obtained from the garnishees in discovery, which states that the terms "contamination" and "pollution" were consciously left undefined in the subject exclusion.

The circuit court never reached the threshold question of whether the umbrella policies' exclusion is ambiguous. After the City filed a motion for sanctions, garnishees moved for partial summary judgment, contending that the exclusion unambiguously prevented coverage under the umbrella policies, but the court deferred decision on that motion until it had ruled on sanctions. As a result, the coverage issue is not before us. Nevertheless, the extent to which parol evidence may be, or become, relevant to the construction of a written contract has some bearing on discovery. If the circuit court had considered the umbrella policies' exclusion to be facially ambiguous, the garnishees might have attempted to eliminate the apparent ambiguity by parol evidence. Thus, discovery by the City would have been concerned with the contingency of rebutting any parol evidence on which the insurers might rely.

## I

Before immersing the reader in the sea of detail of which this case is comprised, we present (A) an overview of the proceedings and (B) an outline of this opinion.

## A

The writs of garnishment were issued February 22, 1993. Garnishees' answers raised thirty-five defenses. The City's first set of discovery was served in May 1993. It principally sought the production of documents relating to the three policies and drafting history of the exclusion. Those requests were addressed at an October 7, 1993 hearing. At that time the court orally approved a proposal for garnishees to produce documents from their underwriting and claims files for the three policies in issue and to maintain a privilege log. Garnishees intermittently and informally gave discovery, extending the production of documents as to which no privilege was claimed into January 1994.

At some point an initial date for trial of June 1, 1994, had been set, but that target was not met. Nor was the discovery cutoff date of April 29, 1994, met.

On March 21, 1994, the *University of South Carolina* case decided that the umbrella policies' exclusion unambiguously applied to asbestos removal claims. On April 14, 1994, the City served notices for the depositions of designees of garnishees who were to bring with them all documents relating to the drafting, use and *application* of the contamination and pollution exclusion in any policies issued by the garnishees to any insureds, and not simply Asbestospray. Garnishees sought a protective order, and on May 6, 1994, the City moved to compel and sought sanctions. At a hearing on May 16 Judge Pines orally directed garnishees, after investigating the availability of documents, to confer with the City. The parties were to report back to the court in the event there were any disagreements. A new trial date in July 1994 was set at that time.

The consultations were fruitless. In apparent anticipation of a revival of the City's motion to compel, garnishees filed with the court on June 29, 1994, an affidavit made in New Jersey on June 28 by a claims representative of garnishees, Mary Mahoney (Mahoney). She asserted, *inter alia*, problems of confidentiality in producing documents from the files of insureds *other* than Asbestospray and raised issues of burdensomeness.

Also, on June 28, 1994, the City served a second set of discovery, including requests for the production of documents involving insureds other than Asbestospray. An accompanying court order, obtained *ex parte* in the manner permitted by Maryland Rule 1–351, shortened the time for response to July 13.

On July 12 the City moved to have the court rule that documents embraced within the City's first discovery request that were noted on garnishees' privilege log were not privileged. At a hearing that same day, of which no official transcript was made, Judge Pines directed production by garnishees on July 26 for his in camera inspection of the disputed documents and set a hearing on the City's motion for July 27. At the July 12 hearing the court also postponed the trial from the July date.

Garnishees moved on July 13 for a protective order as to the City's second set of discovery requests. The City on July 20 filed a third set of discovery requests, principally seeking the production of documents relating to the non-standard exclusion that were furnished to sales representatives and reinsurers. On July 22 the City moved to compel answers to its phase two discovery requests, and the City also moved for sanctions.

By the time of the hearing on July 27 Tanis had not transmitted to the court copies of all of the documents recorded on the privilege log. On order of Judge Pines, deliveries were made within a day to the court of what garnishees represented were copies of all of the documents for which they claimed privilege, and Judge Pines took the privilege issues

*sub curia.* Also on July 27 Judge Pines orally granted the City's motion to compel discovery of documents concerning other insureds, and he orally denied the protective order. Assembly of the documents was ordered to be made by August 16. Judge Pines also advised that he would be available to counsel by phone at home during August, but that he would be out of the country from September 15 to October 15.

Garnishees moved on August 12 for reconsideration of the July 27 order to produce. They again raised burdensomeness and confidentiality. In a telephone conference hearing on August 17, the court denied the motion to reconsider and orally ordered the garnishees to assemble the requested phase two documents within five days in Baltimore, that is, by August 22. The court said that "we will argue about confidentiality later." This directive of August 17 is the principal order compelling discovery under Maryland Rule 2–432(b) for the violation of which sanctions may be imposed pursuant to Maryland Rule 2–433(b) and (c).

Garnishees on August 22 began a document production which did not include documents concerning other insureds. Garnishees also, by letters dated August 19, 1994, notified hundreds of other insureds that production had been ordered of documents concerning them that were embraced by the court's directive. As a result, a barrage of communications fell upon the court, launched by and on behalf of other insureds who were concerned with confidentiality. There followed a brief period in which the parties at times seem to have made some effort, without success, to resolve, even on an interim basis, what garnishees refer to as the confidentiality impasse.

On August 25 the City renewed its motion for sanctions. That motion was heard on September 13 and taken *sub curia.* Upon Judge Pines's return from his trip, the garnishees on October 18 wrote to the court advising that production of documents concerning insureds other than Asbestospray awaited the court's resolution of the confidentiality issues. On November 1 Judge Pines responded by entering an order of

default against garnishees as a sanction for the discovery violations described therein.

The court's findings of violations are set forth in the section of the court's opinion headed "Discussion" which reads as follows:

"The City filed its first set of discovery in May of 1993. Garnishees have to date failed to provide the City with some 18 answers to interrogatories. When this court directed Garnishees to produce withheld documents for *in camera* review, a substantial number of documents were not included with the material produced.

"The City filed a second set of discovery to which Garnishees responded by moving for a protective order. Garnishees' motion was denied, as was their motion for reconsideration of that denial. Rather than answer interrogatories and produce documents requested, Garnishees informed hundreds of their policyholders that documents were being sought in the instant litigation; the effect of this was to invite further motions for protective orders. Additionally, several responses are still outstanding with respect to the Plaintiff's third request for production of documents.

"The Court of Appeals has consistently held that 'failure to furnish discovery sought under our Rules can result in the sanction of dismissal of a claim or an order of default.' Berrain v. Katzen, 331 Md. 693, 699 [629 A.2d 707] (1993). 'To hold otherwise would undermine the administration of our courts.' Id. (citations omitted).

" '[G]enerally there exists an element of defiance and/or recalcitrance where the severe sanction of default is imposed.['] Lakewood Engineering & Mfg. v. Quinn, 91 Md. App. 375, 387 [604 A.2d 535] (1992). Where a failure of discovery amounts to a 'stall' a sanction of default is justified. Rubin v. Gray, 35 Md.App. 399 [370 A.2d 600] (1977).

"It is clear that despite repeated efforts[1] by this court to resolve disputes and facilitate discovery, Garnishees are more interested in slowing the proceedings than defending

their case. Garnishees' recalcitrant behavior is typified by their soliciting the intervention of policyholders in an effort to forestall production of documents—after Garnishees' two failed attempts to obtain protective orders. Furthermore, Plaintiff's Motion for Sanctions has been held *sub curia* for well over a month without any further production by Garnishees.

"1. It is immaterial how one characterizes these efforts. Be they 'orders,' 'directives,' or 'suggestions,' the fact remains that they were largely ignored. Formal orders to compel are not a prerequisite to the imposition of sanctions. Md. Rule 2–432(a)."

Following a January 12, 1995 hearing, the court extended the order of default by entering money judgments against the garnishees. After hearings on three days in January and February 1995, the court entered a judgment on April 26, 1995, against garnishees and their counsel for the attorneys' fees incurred by the City.

## B

In the succeeding parts of this opinion we present in more detail the events on which the court relied in finding violations and in imposing the ultimate discovery sanction.

In part II we follow the tangled trail of phase one of the City's requested discovery. There we point out certain errors of material fact that formed part of the basis for the default sanction. Parts III and IV deal with phase two. There we hold that the court exceeded its discretion in that the order to compel of August 17, 1994, was burdensome and failed to consider protections for the confidentiality interests of third parties. Part V briefly addresses the City's third set of discovery. Part VI is a conclusion, remanding this case.

We fully recognize that ruling on discovery disputes, determining whether sanctions should be imposed, and if so, determining what sanction is appropriate, involve a very broad discretion that is to be exercised by the trial courts. Their determinations will be disturbed on appellate review only if there is an abuse of discretion. That review, however, does not involve a search of the record for grounds, not relied upon

by the trial court, which the appellate court believes could support the trial court's action. A "right for the wrong reason" rationale does not apply to the imposition of discovery sanctions as presented in the instant matter, because that rationale would have the appellate court exercising its discretion in the first instance. *See In re: Adoption/Guardianship No. 10935 in the Circuit Court for Montgomery County*, 342 Md. 615, 629–30, 679 A.2d 530, 537 (1996).

For this reason our review does not consider certain arguments, advanced by the City as support for the default, that allege misconduct by garnishees in the scheduling of one or more depositions and in the responses of Mahoney at her deposition.

## II

### A

The City's first discovery papers were concerned principally with the three policies and their drafting history. The papers consisted of twenty-eight interrogatories, eleven requests for production of documents, and twenty-eight requests for admissions of fact directed to each garnishee. Although we are unable to determine how Judge Pines concluded that eighteen interrogatories were unanswered, the count is immaterial. The City attached copies of the two umbrella policies and of the primary policy to each set of interrogatories propounded to each insurer. Each insurer, appropriately in our opinion, declined to answer interrogatories concerning policies issued by the other insurer, thus swelling the total count of unanswered questions. For example, twelve interrogatories propounded to USFI related to North River policies.

More important, with respect to the requests for production of documents, each garnishee, after reciting a boilerplate non-waiver of various objections, responded that it would furnish non-privileged portions of that insurer's underwriting file on the specific policies issued by it.

But the garnishees, assigning reasons that were totally inadequate, also refused to answer in this garnishment action whether they were indebted to Asbestospray, and they refused to answer whether they had posted any appeal bonds for Asbestospray.[1] In addition, garnishees' recitation of defenses that were not being waived included a denial of the existence of the three specific policies, copies of which the City had attached to its requests.

At the October 7, 1993 hearing on the City's phase one discovery, garnishees distinguished between the drafting history of the contamination and pollution exclusion and the underwriting of the Asbestospray risk. They said that "[d]rafting history could be voluminous," and "extremely burdensome" to put together. Counsel for the City submitted that there had to be a file or files relating to the three policies. Garnishees replied: "That is the underwriting and claims file, which we have agreed to produce."[2] Garnishees also agreed to maintain a privilege log. Counsel for the City said, "We will explore that and see where we are." The court concurred ("Explore that and come see me if there are any problems.").

What thereafter transpired, with respect to the City's phase one discovery, is *not the subject of any specific fact-finding* by Judge Pines, and it must be reconstructed.[3] The phase one

---

1. The answers to the City's first phase discovery requests, although signed by garnishees' initial local counsel, apparently were prepared in New Jersey utilizing a different style of case captioning from the traditional Baltimore area caption utilized by initial local counsel on other papers filed in the action that apparently were prepared by him.

2. This statement by initial local counsel for the garnishees, by including claim files, enlarged the scope of what would be produced beyond that described in the written answers. Whether this enlargement was a factor in garnishees' changing local counsel does not, of course, appear in the record.

3. Discovery is to be conducted between counsel, and the trial court should become involved only in the event of a dispute which counsel cannot resolve after good faith efforts. *See* Rule 2–431. Under that system, in reconstructing the course of discovery, courts, trial and appellate, must rely on the exhibits furnished by the parties as attach-

documents may be divided into three categories: documents produced in full, documents produced with redactions, and documents withheld from discovery on the ground of privilege.

## B

The documents produced in full are significant on the sanction issue. At the hearing on extending the default the court expressed, as one reason for its entry of the default, the court's belief that garnishees had tried to conceal the existence of the three policies. The documents produced in full evidence the existence of the policies and contradict that belief.

In an affidavit filed on February 21, 1995, Tanis describes the discovery furnished by garnishees following the court's October 1993 direction to explore the Asbestospray underwriting and claim files.[4] She states that her "office" commenced a document review. A list of the depositions of the former owner of Asbestospray, a deposition of Asbestospray's insurance broker, and a transcript from the *University of South Carolina* case were sent to Fox in December. On January 10, 1994, copies of the garnishees' certificates to carry on the insurance business in various states were sent to Fox, as had been ordered by Judge Pines. On January 24 documents that Tanis describes as "representing the relevant, non-privileged portions" of the garnishees' claim and underwriting files on Asbestospray were sent to Fox. Fox, in April, requested the privilege log which Tanis *then* caused to be prepared. Tanis acknowledges that, per her instructions, documents excluded from production on the ground of privilege included attorney-

---

ments to motions for discovery orders and to the responses thereto, and on the representations of counsel at hearings on discovery motions.

**4.** Tanis's affidavit was filed after final judgment was entered on the default. It may, of course, be considered in connection with the judgment for counsel fees. We use it in tracing the history of the phase one discovery because it is a convenient vehicle for relating the background for possibly disputed issues. We do not imply that the affidavit is factually binding on the trial court as to disputed issues.

client communications, work product, joint defense papers, and records relating to reinsurance, reserves, and billing.

At a hearing on May 16, 1994, Fox advised the court that he had not received the privilege log although Tanis said it had been sent to him on April 29. When a copy was produced in court, Fox noted that it did not identify senders and recipients, and Tanis agreed to revise.

Tanis's affidavit states that she thought that the log, revised as of May 24, was forwarded to counsel for the City on May 25, but, when Fox wrote to Tanis on June 13 and June 21 stating that he had not received it, she forwarded copies to Fox and Tuerk on June 21. She states that the City then asked that the people named on the log be identified by occupation, that she did so, and that that information was sent on June 27, 1994.

At the January 12, 1995 hearing on the City's motion to extend the default to a final judgment, the City utilized as exhibits documents previously obtained from the garnishees in discovery. An affidavit by an attorney for the City in part stated that "[i]n response to the City's discovery requests in those garnishment proceedings, documents were produced to Plaintiff which demonstrate the fact that Garnishees have admitted to the issuance of the insurance policies. . . ." Various exhibits to the City's motion bore the document numbering utilized by garnishees for their production. The City's exhibits included the previously produced Coverage and Claim Handling Agreement entered into in August 1987 between garnishees and other insurers of Asbestospray. An exhibit to that agreement based the garnishees' participation on the two umbrella policies, as well as the primary policy.

## C

The documents withheld by garnishees as privileged and the unredacted version of documents disclosed in redacted form were the subject of a motion by the City for in camera review by the court. The certification reflects service of copies of the motion by Federal Express and by ordinary mail on July 12 to

Finney and to Tanis. Attached as an exhibit to the City's motion was the privilege log prepared by Tanis consisting of thirty pages, dated May 24, 1994, listing documents withheld, and a thirty-first page, dated June 26, listing redacted documents. The City's motion was one of the subjects discussed at a conference with the court on July 12. Tanis was not present at the conference, of which no transcript was made. What transpired is evidenced by a letter from Finney, dated July 13, to Tuerk and Fox, with copy to Tanis and Judge Pines. Finney proposed a schedule under which, by July 26, 1994, "garnishees [would] file response to Plaintiff's Motion to Compel, together with the disputed documents to Judge Pines for in camera review only." A hearing, if necessary, would be held on July 27. All participants at the July 12 conference seem to have understood that the in camera inspection would embrace documents wholly withheld on the ground of privilege, as well as the partially redacted documents.

Tanis stated that, after ordinary business hours on July 26, she undertook to transmit, by facsimile to Judge Pines at the courthouse, the redacted documents, their unredacted counterparts, and a memorandum of law on privilege. She also caused copies of the same to be sent to OKG & S. It developed at the hearing on July 27 that Judge Pines had received only the redacted copies and the memorandum. Finney quickly cured the absence of the unredacted counterparts with copies from Tanis's transmittal to OKG & S, as evidenced by the transcript of the hearing.

At the July 27 hearing Judge Pines spoke by telephone to Tanis in New Jersey. She said that she had not understood that the court intended so extensive a review as to include some 1,500 pages of privileged documents. Judge Pines ordered Tanis to have a copy of those documents in Finney's hands for delivery to the court the next day.

In her affidavit Tanis states that she immediately arranged for a commercial copying service to make two sets of copies of the privileged documents from the originals. Both sets were

shipped overnight to garnishees' Baltimore counsel who retained one and delivered the other on July 28 to Judge Pines.

The 1,500 pages of documents reflect a very large volume of litigation against Asbestospray throughout the United States. A law firm in Minnesota was coordinating the litigation under the claims handling agreement. Most of the documents are reports of counsel on the status of the litigation, including opinions, projections of outcome, and discussion of tactics.[5]

Judge Pines properly could have found that there was foot-dragging by garnishees in producing documents and the privilege log between October 1993 and July 1994. But, when the court explicitly ordered production to it of the documents underlying the privilege log, substantial compliance was swift, as we explain in subparts II D, E, and F, below.

## D

With respect to the City's phase one discovery, a principal basis for imposing the default sanction seems to have been what the City calls, "The 'Missing' Privileged Documents Ordered Produced by Judge Pines." Brief of Appellee at 41. Our review reveals that the incident involved poor document control, that the omissions are not nearly as extensive or as material as the court seems to have thought, and that the incident definitely does not involve the "smoking gun" that the City tried to make it out to be.

That the court had a problem with garnishees' July 28 production of claimed privileged documents was first mentioned at the September 13 sanction hearing. A law clerk who was made available to Judge Pines had compared the Bates numbers on the papers produced to the court with the numbers appearing on the privilege log and listed the pages of logged documents that were "missing" from the 1,500 pages of documents produced to the court. After the hearing Daly of

---

**5.** These documents clearly comprised work product as of the time the documents were created and in the litigation for which they were created.

OKG & S met with the law clerk. They decided that garnishees' furnishing copies of the missing pages that the law clerk had listed would be simpler than thoroughly searching the court file which embraced the original multi-defendants products case as well.[6] Under cover of a letter of September 28, 1994, from Connie R. Miracle (Miracle), a legal assistant at OKG & S, sixty-one "missing" pages were delivered to the law clerk, while Judge Pines was out of the country.

The sixty-one pages were not further specifically mentioned by the court until the money judgment hearing, held on January 12, 1995. At that time Judge Pines explained what he had in mind when he said in his November 1, 1993 opinion that "a substantial number of documents were not included with the material produced." Furnishing the explanation came about out of the background described below.

Tuerk had caused a letter dated January 5, 1995, to be hand delivered to Judge Pines. By inadvertence, for which counsel apologized, a copy of the letter was not sent to any of the attorneys for the garnishees. The City's letter anticipated "that information contained in the documents for which Garnishees earlier claimed a privilege ... may become relevant and indeed crucial to the issues raised at the January 12th hearing." The City requested that the court "[p]romptly release to Plaintiff's counsel all of those documents which the Court has determined not to be subject to any applicable privilege," and that the court have all of the documents present in the courtroom at the hearing. The purpose of the latter request was to enable the court "to determine after hearing the issues raised by Garnishees' counsel whether any applicable privilege would be vitiated through fraud or whether the issues raised ... would create an extreme need or hardship...."

In a legal memorandum served on the eve of the hearing garnishees had reasserted that they "have been unable to

---

**6.** Under Maryland Rule 2–645 a garnishment under a judgment is filed in the same action as that in which the judgment was entered.

locate complete, signed and countersigned copies of what are alleged by [the City] to be contracts of insurance issued to Asbestospray Corporation."

At the January 12, 1995 hearing the City asked the court to rule on privilege. Garnishees objected to enlarging, without notice to them, the scope of the hearing to include document by document privilege rulings. The court, recollecting its in camera review, said that there were three classes of documents, those that were work product or attorney/client but did not "in any way impact on this particular case," those that were not privileged, and the sixty-one pages that were supplied after the court had called attention to the gaps in the Bates numbers. The court said the latter two categories "reference insurance, they reference coverage, they reference policy numbers and so forth, and especially the sixty-one that were added...." The court ruled that all 1,500 pages of documents were part of the record for appeal.

Garnishees, after determining that the ruling had not put the documents in evidence for use at the hearing, then moved to have the documents placed under seal, with no right in the City to see any of them until the court ruled specifically on each. At that point the court ruled that harm to the City outweighed any asserted privileges, and that all of the documents were discoverable and were available to the City for use at the hearing then being conducted.

The court then recessed the hearing for one-half hour to enable the City quickly to review the privilege log documents. When the hearing resumed, the City introduced as exhibits documents culled from the mass of documents ruled discoverable that day, in addition to documents previously obtained from garnishees in discovery.

When garnishees renewed their objections, the court stated: "I have to in some manner explain to you again, one of the reasons why I made these documents available.

"I'm well aware of the privileges and have been very zealous in attempting to go guard them, but for me, after what these exhibits portrayed, to hold them within my

knowledge and my [breast] would make me a portion of this problem. I hate to characterize what it was.

"Fifteen hundred pages were given to me for in camera review, 1,500 pages of mostly reports that could have been innocuous.

"However, until I asked where or what was the importance of the missing pages and they were produced, until that time, they were withheld.

"And they, to my thinking, went to the heart of the problem, the identified insurance, the identified policies.

"And in the gross picture, 1,500 I believe pages were placed there to act as an obstacle to prevent the Court from reviewing the material which was merely a diversion tactic."

Thus, the court's analysis of the sixty-one pages was that they were relevant to the issue of whether garnishees even had issued policies to Asbestospray. In view of the discovery that garnishees had furnished, the existence of policies was not one of the major issues on the merits of the garnishments, even though the garnishees persisted in preserving that possible defense. Of greater significance to the merits of the garnishments, and, therefore, to the discovery, were the issues of whether the contamination and pollution exclusion was ambiguous, or could be demonstrated to be unambiguous by extrinsic evidence.[7]

### E

The court's conclusion that, in effect, garnishees intentionally withheld the sixty-one "missing" pages for the purpose

---

7. The City's exhibit nine at the January 12, 1995 hearing was a copy of the coverage and claim handling agreement of August 1987 between garnishees, two other liability insurers, and the Asbestospray companies. Under that agreement the primary insurers on policies issued from 1964 through 1978 agreed to defend the Asbestospray companies and to bear the cost of defense in percentages based on the years of coverage. All of the insurer parties to the agreement, including the garnishees as excess carriers, reserved their rights as to indemnification of the insureds for, *inter alia*, "alleged damage to property as a result of the installation, containment, or removal of asbestos and/or asbestos products if any of The Insurance Companies determines that any such claim is excluded...."

of suppressing evidence of the existence of the three policies is based on clearly erroneous fact-findings. At the January 12 hearing the City introduced a batch of documents obtained by it for the first time that day when the City culled them from the box of 1,500 pages. This batch was marked exhibit three. The purpose of exhibit three was to demonstrate the existence of the policies. At that hearing the City also had obtained for the first time, and introduced, the sixty-one "missing" pages of documents that had been delivered by Miracle to the law clerk in September. Indeed Judge Pines, from the bench, identified that bundle of papers as the sixty-one "missing" pages by the large clip that fastened them together. The bundle of sixty-one pages was marked exhibit four.[8]

There is nothing particularly remarkable about the documents in exhibit four that distinguishes them as evidence of the existence of the policies from the documents selected by the City for introduction as exhibit three, or from the previously produced documents attached as exhibits to the City's motion. Further, most of the 1,500 pages of claimed privileged documents that remained after those comprising exhibit three had been removed also support the fact that the garnishees were participating in the defense of Asbestospray under one or more insurance policies and under the claims handling agreement.

The City focuses on pages Bates numbered 900,715 through 900,723, which were among the sixty-one "missing" pages, and argues that they critically affected garnishees' defenses. The City submits that garnishees' "own Privilege Log went to some lengths to misidentify these critical documents," and that the misdescription's purpose was "to mislead the court and the City in hope of keeping the documents from coming to light...." Brief of Appellee at 42.

The privilege log furnished by garnishees to Judge Pines described those nine pages as "[h]andwritten notes and memo-

---

8. This opinion uses the numbers appearing on the evidence stickers affixed to the original exhibits by the court clerk, which reverse the numbers used by counsel in identifying the exhibits for the transcript.

randum concerning litigation," dated January 28, 1987, from A. Kirkner to J. Camerino. The first two of the nine pages are longhand notes referring to a declaratory judgment action, brought by one of the primary insurers of Asbestospray, which led to the claims handling agreement. The content of the next five pages, which are typewritten, is accurately described in the log and deals with the same litigation. The last two pages, numbered 900,722 and 900,723, are a typewritten memorandum dated November 7, 1983, from a bodily injury claims specialist, Neal McHugh, in New York to one Homer Rhule in a New Jersey claims office. The memo deals with two bodily injury claims against Spraycraft in Texas. With respect to the USFI excess policy, McHugh refers to Rhule's having had "the original of this policy." McHugh states that he does not think that the pollution exclusion "would apply to the Asbestoes [sic] claims." [9] The memo also refers to the North River primary policy and to the establishment of a file under the North River excess policy.

Judge Pines made no finding that the description in the privilege log, considered in and of itself, was intended to deceive, and we will not make an original finding to that effect. Nor does the content of the McHugh memo of November 7, 1983, support finding an intent to conceal. The content of that memorandum is substantially the same as the content of a memorandum of November 3, 1983, from Rhule to McHugh that was furnished to the City in discovery, Bates Nos. 000,134 and 000,135, and that was used as an exhibit by the City to its

---

**9.** The full text of the paragraph containing the immediately referenced quote reads as follows:

"In reviewing my copy of the policy, I note an endorsement relating to contamination and pollution which is essentially an exclusion. The input of this endorsement is a re-definition of occurrence as it affects contamination of the land water air or any injuries resulting therefrom. The bottom line is all damages arising out of such exposure to substantially this same general condition shall be considered as arising out of one occurrence. I don't think it would apply to the Asbestoes [sic] claims but I bring your attention to it for whatever relevancy it may have."

motion heard January 12, 1995.[10]

In any event, the November 7, 1983 McHugh memorandum, although listed by the law clerk as a "missing" document, was not in fact missing. The November 7, 1983 McHugh memorandum, Bates Nos. 900,722 and 900,723, is a part of exhibit three and is a part of exhibit four, both of which were introduced by the City at the January 12, 1995 hearing. A copy of the November 7, 1983 McHugh memorandum is among the documents under Judge Pines's clip as part of the sixty-one pages delivered to him that were replacements for pages "missing" from the box of claimed privileged documents, and the McHugh memorandum is also part of the exhibit that was put together at the hearing by the City from claimed privileged documents culled from the box of documents pursuant to the court's permission. In other words, the November 7, 1983 McHugh memorandum was in the box of claimed privileged documents delivered to Judge Pines in July 1994 and was erroneously considered to be a "missing" document, leading to the delivery of a second copy by OKG & S's paralegal in September 1994, with the result that the City introduced both copies into evidence in January 1995.

There is no smoking gun.

### F

The City's motion that it be awarded its counsel fees as an additional sanction was first heard on January 31, 1995. At that hearing the City pressed the sixty-one "missing" pages as the reason for awarding fees. The City asserted that counsel for the garnishees participated in the purported concealment, and in support thereof, the City pointed to the facsimile transmission legend appearing at the top of pages of documents forming part of the sixty-one pages. That legend indicated receipt at OKG & S on July 26, 1994. Finally, when

---

**10.** McHugh's statement that Rhule had the original of the USFI umbrella policy does not appear in the November 3 memorandum, but in that memorandum Rhule states that he has a copy of the North River primary policy.

Finney undertook to respond, utilizing a copy of the list of the "missing" pages prepared by the law clerk, Judge Pines was openly skeptical concerning the authenticity of the second and third pages of the list.[11]

Within two days garnishees filed a letter to Judge Pines from the law clerk who wrote on the stationery of the administrative judge of the circuit court. In substance the letter confirmed that the list of "missing" pages utilized in argument by the garnishees was that utilized by the law clerk.[12]

The law clerk's letter and tabulation were exhibits to a memorandum, filed February 2, 1995, by the garnishees in which they undertook to account for all but seventeen of the "missing" pages. The City does not directly challenge garnishees' reconciliation, but, instead, it argues the significance of the McHugh memorandum and that garnishees' reconciliation and exhibits were filed too late to be considered in connection with the default judgment. We have already discussed the McHugh memorandum, *supra.*

In order not to deprive the City of a possible procedural advantage, we shall review the sixty-one "missing" pages

---

11. For example, the court said:

 "I don't know what it is either. This is not the list that I had prepared after review of the documents, and this is—I don't even know what it is."

 The court further said:

 "But I don't accept that as a list of missing documents. The missing documents, the 61 were enumerated on various pages. This first page is in the typing of what I would recognize as what was being used and the type of list. And the second and third pages were not what I asked to be presented to Mr. Daly."

12. The first page of the tabulation was the thirty-first page of the privilege log attached to the City's motion for a ruling on privilege. It is the page dated June 28, 1994, listing the documents furnished to the City in redacted form. The second and third pages were prepared by the law clerk, using a different format from the first page, in that the information was presented in columns of boxes.

 The clerk's tabulation lists fourteen pages of redacted documents and twenty-one pages of other documents from the privilege log. The label, "sixty-one 'missing' pages," is derived, not from the law clerk's tabulation, but from garnishees' production in response.

argument exclusively from documents that Judge Pines possessed in September 1994, namely, those marked as exhibits three and four on January 12, 1995, the privilege log attached by the City as an exhibit to its motion for in camera review, and the remaining documents from the boxful furnished for that review. Our review of the pre-default record discloses the following:

14 Pages of redacted documents listed on the thirty-first page of the log. These are additional copies of the same documents facsimile transmitted to the court in the incomplete transmission on July 26. [13]

14 Pages in unredacted form of the fourteen pages in redacted form. These are additional copies of the same documents hand delivered to the court after the hearing on July 27.

2 Pages of dividers respectively separating the redacted and unredacted pages.

6 Pages that are part of exhibit three. In addition to the McHugh memorandum, they are Bates Nos. 900,010 through 900,013.

2 Pages that are still in the box of claimed confidential documents. They are Bates Nos. 900,224 and 900,778.

1 Page of duplication. Redacted page Bates No. 001,151 is the same document as No. 001,133. No. 001,151 is not included in the count of fourteen redacted pages.

1 Page furnished by garnishees in September that was not on the privilege log. It is Bates No. 001,153 and is the first page of the redacted document logged as 001,154–56.

—
40 Subtotal

21 Remaining pages not furnished in July but furnished in September.

—
61 Total

---

13. Actually two of these pages, Bates Nos. 000,427 and 000,442, were not requested by the City to be reviewed in camera. They were deleted from the exhibit to the City's motion, but were included in the delivery of the sixty-one pages.

Of the twenty-one pages not furnished in July, ten comprise one document, a list of approved local counsel for each state. The list's first page, 000,442, was recorded on the log of redacted documents, but was deleted by the City from the list of documents for which it sought in camera review. The September production of sixty-one pages included the additional nine pages of the counsel list, numbered 000,443 through 000,451. Thus, only thirteen pages of the sixty-one produced in September are unaccounted for in relation to the production ordered in July.[14]

Inasmuch as Judge Pines ruled that the City's need to discover all of the 1,500 claimed privileged documents exceeded the interest protected by any privilege, one would expect that the sixty-one pages allegedly withheld by garnishees, or at least the unaccounted for thirteen pages, must have been of exceptional value to the City from a discovery standpoint. They are, in fact, not in the least remarkable, and, but for the McHugh memorandum that was timely produced, the City does not argue their significance.

The kindest observation that we can make concerning the City's argument in the trial court based on the facsimile transmission legends is that appellate counsel for the City did not explicitly include the argument in the City's brief to this Court. In exhibit four of January 12, 1995, the legend appears on redacted documents and their unredacted counterparts. The record is quite clear that Judge Pines had both sets of documents on July 27 and that they were delivered to him again on September 28, 1994, by Miracle.

Because facts that the court considered to be material were based on clearly erroneous findings, violation of the order to

---

14. They are Nos. 900,587, 900,715 through 900,721, 900,789, 900,792, 900,827, 901,346, and 901,347.

produce the privilege log documents cannot be used to support the sanction of default and its dependent counsel fee sanction.

## III

## A

The City filed its phase two discovery papers on June 28, 1994. They consisted of seventeen interrogatories, most of which sought the identification of classes of documents, and one request for the production of all of the documents identified in answers to interrogatories.[15] At least three of the phase two interrogatories were directed to the existence and application of the contamination and pollution clause in policies issued to insureds of garnishees other than Asbestospray.[16]

---

**15.** The City's phase one discovery from each garnishee had included twenty-eight interrogatories, and garnishees argue that the seventeen interrogatories of phase two put the City over the limit per party of thirty interrogatories under Maryland Rule 2–421(a). The circuit court, *sub silentio*, rejected this argument and, in effect, granted leave that the number be exceeded. Whether that grant of leave was an abuse of discretion is secondary to the issues involving the subject matter sought by the discovery.

The City contends that the court, by order in the underlying tort case, had removed the limit on interrogatories, but that order is not included in the record extract or in the original record.

**16.** Interrogatories ten, eleven, and one were the principal interrogatories directed to other insureds. They read:

"10. Identify any document in which you have denied an obligation to defend or to pay asbestos-related property damage claims to an insured for a policy that contains a pollution and contamination clause other than Asbestospray and Spraycraft, and, if so, the insured's name and policy number(s).

"11. Identify any other former manufacturer of asbestos-containing materials, other than Asbestospray, who was insured by you and state:

a. Whether the policies contained any pollution and contaminations exclusions and, if so, state the specific policy numbers and language of the exclusions.

b. State whether any asbestos-property damage claims were paid pursuant to any policy, and, if so, under what circumstances. Provide specifics as to the claim and identify all documents relating to the claim, including the policy involved.

"1. State whether you have ever included in any policy or endorsement specific language regarding asbestos, whether it excludes, includes or limits coverage, and, if so:

The court shortened the time for answering the interrogatories and the request for production to fifteen days. On the fifteenth day garnishees moved for a protective order, arguing primarily that the requested discovery was overly broad and unduly burdensome. The garnishees' opposition also relied on an affidavit by Mahoney, then on file with the court.

In her affidavit Mahoney stated that "[c]laims and underwriting files frequently contain confidential and proprietary materials, documents and information obtained from insureds during the course of underwriting a policy or adjusting a claim." She pointed out that "many of the claims and underwriting files of other insureds are subject to confidentiality agreements and/or protective Orders issued by various courts." The garnishees, Mahoney said, maintained their files by the name of the policyholder and "are not indexed according to the coverage issues presented." She estimated that "tens of thousands of individual files ... would have to be manually reviewed" to determine the information sought by the City in any particular claim. The City moved "to compel the answers to interrogatories and [the] document request" and also sought sanctions.

At the July 27 hearing the court, referring to its policy of liberal discovery, granted the motion to compel, and denied the protective order. The court indicated that the garnishees could make the requested documents available in Morristown.

---

a. State the exact language in the policies.

b. State when this language was first added.

c. State the reason the language was added.

d. Identify any documents or other materials which effectuate this language, discuss whether this language should be included, or discuss whether this language was necessary.

e. State whether this language was ever changed and if so, re-answer (b-d) for each change.

f. State whether any pollution and contamination exclusion clause was in the policies or endorsements that contained the language regarding asbestos, and, if so, identify each policy, the client, the language in each clause, and policy number for each policy that contained both.

g. Identify the person most knowledgeable about any asbestos-specific policies issued by you, with job title and address."

When the court suggested doing so within ten days counsel for the City expressed doubt that the garnishees were prepared to respond so quickly and suggested twenty days, which the court adopted. The court told local counsel for garnishees that "if there's some problem, let me hear from you." The court reserved ruling on the City's motion for sanctions. August 16 was the twentieth day from July 27.

On August 12 garnishees moved for reconsideration. In support, garnishees filed the affidavit of Paul Bowlby (Bowlby). Bowlby was a supervisor for Envision Claims Management Corporation (Envision) which handled environmental claims for the garnishees. His affidavit reiterated much of what Mahoney had said concerning burdensomeness and confidentiality. Bowlby also stated that his employer had handled approximately 5,984 account files, each representing a separate policyholder. Once a file was established because of a claim against a policyholder, subsequent claims against the same policyholder were included in the same claim file. His employer presently had a record of 868 "asbestos claim files" involving claims against insureds of the garnishees.

In a telephone conference hearing on August 17 the court denied the motion for reconsideration and set August 22 as "the date to comply with answers to the requested information." Daly, for the garnishees, then advised the court that "because of the confidentiality requirements with policyholders, all of those policyholders would have to be notified." This was to afford the policyholders an opportunity to raise any problems that they needed to have resolved. The court replied:

"Well, may I suggest to you this, get them [*i.e.*, the requested phase two documents] in a nice neat pile and have them on somebody's desk here in Baltimore, preferably yours, and we will talk about them at that time. Just assemble them and get them together."

Daly urged the court first to order a sampling, in order to get guidance on the scope of the problem, but the court, at the conclusion of the telephone conversation, reiterated:

"All right. Well, look, I want them put in a pile and we will argue about confidentiality later. Just assemble them. Get to work on that. All right?"

## B

Unfortunately, the parties and the circuit court addressed the phase two discovery as an inseparable unit, as if the requested discovery had to be either completely proper or entirely improper. The interrogatories were not inseparable. For example, there is no reason why the garnishees should not have identified the person in their respective organizations who was most knowledgeable concerning record retention policies. Furthermore, in their memorandum in support of their motion for a protective order the garnishees cited the circuit court to a goodly number of unreported trial court opinions that were said to have disallowed similar document requests. Incredibly, garnishees did not attach copies of those unreported trial court opinions to the memorandum, but did so when moving for reconsideration.

■■■ Despite these and other shortcomings of garnishees, we hold that the trial court exceeded its discretion when it ordered garnishees, within approximately twenty-six days after the initial denial of the protective order, to assemble, and perhaps to produce for the City's inspection in Baltimore, documents from the underwriting and claims files of other insureds. These were insureds who were asbestos manufacturers, or whose policies contained specific language concerning asbestos, or whose policies contained a contamination and pollution clause and against whom asbestos-based claims had been asserted. First, the requested discovery would be only contingently and marginally relevant under the Maryland law concerning the interpretation of written contracts. *See* the introduction to this opinion. Thus, although the trial court had discretion to allow discovery to proceed before deciding whether the policy language was ambiguous, proceeding in that fashion was inefficient. If the court decided that the exclusion was facially ambiguous, and if garnishees sought to

prove lack of ambiguity factually, the scope of the City's discovery would have been limited to matters relevant to the facts relied upon by the garnishees. Second, the court had already ordered discovery from the underwriting and claims files of the Asbestospray companies, and the magnitude of the examination of the files relating to Asbestospray had been amply demonstrated by the box of 1,500 pages of claimed privileged documents that the court had had since July 28. Third, the circuit court seems to have given almost no weight to the affidavits describing the magnitude of the search; yet, those affidavits do not appear to be unreasonable on their faces.[17] Fourth, our research of insurance coverage cases neither discloses, nor have we been cited to, any decision, reported or not reported in the official reports, that directs, as does the subject order, a production of the records of a class of non-party insureds that is *unlimited* in scope and *unlimited* as to use. The lack of limits on scope is discussed in subpart C, *infra,* and the lack of limits on use is discussed in Part IV, *infra.*

## C

The numerical majority of the cases deny any discovery of the records of other insureds, either on the ground that it will not lead to the discovery of relevant evidence, or on the ground that the relevance is so clearly outweighed by the burden of production that production is denied.

*Continental Ins. Co. v. Sea–Port Servs., Ltd.,* Civ. A. No. 86–267–JLL, 1988 WL 159937 (D.Del.1988), involved an insured's claim for the costs of cleanup of hazardous substances. The insured sought discovery of "all complaints, answers, discovery responses, and affidavits filed by [the insurer] since 1983 in any environmental litigation in the United States in which it sought to avoid recovery based on the policy provi-

---

17. According to II *Best's Insurance Reports, Property–Casualty, United States,* at 4363 (1995), USFI had admitted assets as of December 31, 1994, of $2.874 billion, and North River's admitted assets as of the same date were almost $728 million. *Id.* at 4378.

sions asserted in this case. . . ." *Id.* at *1. This information was ruled to be relevant, because "it might well have some tidbit that could be a judicial admission." *Id.* at *2. The court, nevertheless, said that it "must weigh this marginal relevance against the effort to accumulate and comb the information from [the insurers'] litigating files spread throughout the United States. Balancing this effort with the marginal relevancy," lead the court to deny discovery at that time. *Id.*

In *Mead Reinsurance Co. v. Superior Court,* 188 Cal.App.3d 313, 232 Cal.Rptr. 752 (1986), a municipality brought a bad faith action against its insurer which had taken the position that·an underlying claim by a municipal resident against the City was excluded under the policy. The insured sought production of the insurer's " 'claims files relating to every claim similar to the claim at issue' " made from January 1, 1979, to June 1985. 232 Cal.Rptr. at 752. The appellate court reversed an order requiring the production that the insured had requested, because the insurer made "a showing to the trial court of the massive extent of the burden which the request entailed, and the order made no provision at all to mitigate that burden." *Id.* at 756.

Coverage for hazardous waste cleanup was the issue on the merits in *Leksi, Inc. v. Federal Ins. Co.,* 129 F.R.D. 99 (D.N.J.1989). The insured sought, *inter alia,* "information regarding the manner in which the insurers have applied the policy language to claims similar [to the insured's] made by other insureds." *Id.* at 105. In the reported opinion a magistrate held the information was not discoverable because it "not only involves enormous inconvenience and management difficulties, but also entails a frightening potential for spawning unbearable side litigation. . . ." *Id.* at 106. *See also Union Fidelity Life Ins. Co. v. Seay,* 378 So.2d 1268 (Fla.App. 1979); *State ex rel. Bankers Life & Casualty Co. v. Miller,* 160 Mont. 256, 502 P.2d 27 (1972); and the unreported cases cited in the margin, copies of which are reproduced in the appendix

to the brief of *amicus curiae*, Insurance Environmental Litigation Association, filed in this case.[18]

In other cases presenting a discovery issue analogous to that in the instant matter, the courts have given somewhat more weight to potential relevancy than have the courts in the cases cited immediately above, with the result that a limited production of documents relating to other insureds is permitted. The court in *Stonewall Ins. Co. v. National Gypsum Co.*, 1988 WL 96159 (S.D.N.Y.1988), reviewed discovery orders of a federal magistrate. National Gypsum Co. asserted that it was covered for claims by building owners for the removal of asbestos-containing products. Among the insurer-defendants was USFI, and one of the issues was the meaning of "pollution." *Id.* at *2. The magistrate had ordered the insurers to produce "the 'ten earliest and ten most recent claims files subsequent to 1969' that deal with claims asserted regarding asbestos in buildings, leaded paint, foam insulation, and pollution and/or toxic or hazardous waste." *Id.* The court held that the magistrate had appropriately recognized the burden on the insurers and that the discovery order was not clearly erroneous. *Id.* at *3. *See also National Union Fire Ins. Co. v. Stauffer Chem. Co.*, 558 A.2d 1091, 1094 (Del.Super.Ct.1989) (recognizing "the practical consideration that the burden can be limited by tailoring the discovery order" (footnote omitted)); *Nestle Foods Corp. v. Aetna Casualty & Sur. Co.*, 135 F.R.D. 101, 107 (D.N.J.1990) (ordering production of the ten earliest and ten most recent claim and underwriting files

---

**18.** The cases to which we refer are: *In re Texas Eastern Transmission Corp., PCB Contamination Ins. Coverage Litig.*, No. MDL 764 (E.D.Pa. July 26, 1989); *In re Asbestos Ins. Coverage Cases, Judicial Council Coordination Proceeding No. 1072* (Cal.Super.Ct., City & Co. of San Francisco June 1, 1983); *North Am. Philips Corp. v. Aetna Casualty & Sur. Co.*, No. CV–91–0395790 S, 1992 Conn. Lexis 1570 (Conn.Super.Ct. May 21, 1992); *Monsanto Co. v. Aetna Casualty & Sur. Co.*, CA No. 88C–JA–118 (Del.Super.Ct., New Castle Co.1990), *aff'd*, 1990 WL 200464 (Dec. 4, 1990); *Freehold Cartage, Inc. v. Lumberman's Mutual Casualty Co.*, No. L–55313–88 (N.J.Super.Ct., Monmoth Co.1992); *Occidental Chem. Corp. v. Hartford Accident & Indem. Co.*, No. 41009/8D (N.Y.Super.Ct., Niagara Co.1990); *Eaton Corp. v. Aetna Casualty & Sur. Co.*, No. 189068 (Ohio C.P., Cuyahoga Co.1992); *Joseph Simon & Sons, Inc. v. Aetna Fire Underwriters Ins. Co.*, No. 90–2–14568–9 (Wash.Super.Ct., King Co.1992).

pertaining to coverage for pollution or the disposal of hazardous waste).

The order of August 17 compelled a production that was much broader in scope than that ordered in the more liberal of the two classes of rulings described above. Further, between the denial of the motion to reconsider on August 17 and the entry of the default sanction, garnishees added more specific information on burdensomeness to the record. We consider that additional information as part of the discussion in Part IV.

## IV

 The circuit court further erred by ordering production of documents relating to other insureds without ever having decided the confidentiality issue, and by then sanctioning garnishees for alerting their customers to the need to protect themselves. The circuit court had said, when the motion for reconsideration was denied, that it would consider confidentiality in the future, but at that same time the court ordered assembly, and apparently production, to begin on August 22, without giving any directive as to how confidentiality should be handled, pending the court's later determination.

The cases cited in Part III C, *supra*, that permit discovery, limited to a sampling, of files concerning other insureds also make provision for preserving confidential information. In *National Union Fire Ins. Co. v. Stauffer Chem. Co.*, the Delaware court said that the discovery should be "structured to lessen the burden on insurers while protecting the confidentiality of other insureds.... If the relevance of the materials requested outweighs the burden to insurers, then appropriate measures should be taken to protect the confidentiality of the insureds." 558 A.2d at 1095. After ordering discovery as to the ten earliest and the ten most recent files of other insureds, the court authorized the insurers to redact, "to the extent deemed necessary to preclude the release of confidential information." *Id.* at 1096. In *Nestle Foods Corp. v. Aetna Casualty & Sur. Co.*, the court said that the insurers' "concerns of

divulging trade secrets and business practices ... [could] be alleviated by redacting confidential information, including the name of the insured, from the files." 135 F.R.D. at 107. The unreported opinion in *Stonewall Ins. Co. v. National Gypsum Co., supra,* also reflects that the discovery order permitted redaction of the names of other insureds to protect privacy rights. 1988 WL 96159, at *7.

After remanding to the trial court for it to provide for mitigating the burden of producing documents concerning other claimants, the court in *Mead Reinsurance Co. v. Superior Court,* 188 Cal.App.3d 313, 232 Cal.Rptr. 752, addressed confidentiality interests that were recognized by a California statute. The court ruled that the names and addresses of all of the other claimants could be disclosed "on condition that [the insured] first compose a letter, subject to approval by the court, to be sent to each of these claimants seeking permission for [the insurer] to disclose the data in the respective files." *Id.* at 757.

*Independent Petrochemical Corp. v. Aetna Casualty & Sur. Co.,* 117 F.R.D. 283 (D.D.C.1986), reports a magistrate's discovery decision in coverage litigation in which the underlying tort claim against the insured involved dioxin contamination. The insured's requested discovery concerning other insureds was confined by the court to five years, to insureds who had in fact been indemnified, and to dioxin contamination claims only, thereby excluding the insured's request for claims involving benzene, DES, and DDT. *Id.* at 286–89. Then, addressing confidentiality, the court ordered:

"The defendants shall have to December 31, 1986 to search their files for the information required by this ruling and to obtain the consent of third-party policyholders to release any information responsive to Interrogatory 35, as narrowed herein, or alternatively to furnish such information and documents in redacted form identifying the policyholder by a code designation. The defendant responding shall file under seal, but not serve the other parties, a document setting forth the true identity of the policyholder with the related code designation should there be a need for an *in*

*camera* examination in connection with any motion to compel disclosure.... To the extent a third-party policyholder does not object, or the redaction and code designation method is employed, supplemental responses ... shall be filed, and related document production made...."

*Id.* at 288.

In the instant matter, upon denial of their motion for reconsideration, garnishees commenced assembling the documents falling within the City's second discovery request. All open environmental claims files of garnishees and of other Crum & Forster affiliates, as well as some closed files, were maintained at Envision's offices in Morristown. Their volume would fill approximately 1,100 archives boxes. Mahoney caused a database of garnishees' files and a database of open asbestos accounts to be run. These were cross matched and silica claims were excluded, leaving 685 policyholder account files at Morristown that were potentially responsive to the discovery request. This total is the count of policyholders, potentially involved, and not claims against policyholders, inasmuch as each claim against a given policyholder was a subfile of the policyholder's account. Having isolated the policyholders potentially involved, garnishees did two things: they notified the policyholders, and they commenced a manual review of the asbestos claim files. The review sought to identify asbestos manufacturer policyholders, the type of policy involved in the claim, and whether the contamination and pollution exclusion was a part of the policy.

The letter to policyholders, dated August 19, 1994, in significant part reads:

"In order to comply with the Court ruling, it is the intention of [garnishees] to begin the production of information regarding claims that have been tendered by you. If you wish to object to the production of any information regarding claims you have tendered to [garnishees], it will be necessary for you to file an application for a Protective Order in the Circuit Court for Baltimore County [sic]. If you intended [sic] to do so, please notify [a garnishee] as soon as

possible. If [a garnishee] is notified of an intention on your part to move for a Protection [sic] Order, it will not produce information regarding your claim until such time as the Motion for a Protective Order is resolved or the Court otherwise directs. If [garnishees] do not hear from you by August 27, 1994, they will proceed with the Court ordered production of information."

The claim technicians at Envision manually searched the files respectively assigned to them. The process of manually reviewing the 685 account files was nearly completed by September 10, 1994, when Mahoney made an affidavit which was filed the day before the September 13 sanctions hearing. The Mahoney affidavit also advised that there were approximately 47,000 boxes of records in archives at Whitehouse Station, New Jersey, the indices to which did not identify asbestos claims or claims involving policies with contamination and pollution exclusions. Additionally, in storage in Chicago were 12,000 to 14,000 boxes of files similar to those stored at Whitehouse Station.

On August 22, the day set by the court for answering the interrogatories and for putting the documents "in a pile," garnishees served the City with garnishees' answers to the phase two interrogatories, and garnishees produced certain documents at the OKG & S offices. The three interrogatories that had been directed to the policies of, and claims against, other insureds were answered virtually identically by each garnishee. Those answers preserved all defenses, reiterated the argument on burdensomeness, stated that the garnishee was "in the process of noticing all policyholders with respect to the Court ordered production of their files in order to obtain their acquiescence," and concluded that the garnishee "will produce the non-privileged portions of these account files" to the City for its review.

Garnishees' answers to the second set of interrogatories were not filed with the court, but the notice of their service was docketed August 22, per Rule 2–401(d)(2). The answers themselves were not filed until January 30, 1995, after final

judgment had been entered on the default, when the City used them as an exhibit in support of the City's renewed motion for attorneys' fees.[19] Non-filing of discovery material probably explains the court's misstatement in its opinion entering default on November 1 that the garnishees had not answered the second set of interrogatories ("Rather then answer interrogatories ... Garnishees informed ... policyholders.....").

The production by garnishees at OKG & S on August 22 consisted of stacks of documents segregated in accordance with the classes of documents referred to in the City's second set of interrogatories, but did not include the other policyholder documents responsive to interrogatories one, ten and eleven. As to other policyholders, garnishees furnished the City with copies of the notice letters. Also on August 22 garnishees hand delivered to the City, with copy to Judge Pines, a letter advising that the files of other policyholders would be made available in Morristown if the policyholders consented, or if they did not respond by August 27, or when the court resolved any policyholder's request for a protective order. Samples of redacted confidentiality agreements, apparently binding on garnishees, or other policyholders, or both, were enclosed to the City and to Judge Pines. Garnishees expressed their anticipation that all documents "marked" by the City, *i.e.*, "documents designated by [the City] during [its] inspections in Morristown," would be subject to an appropriate confidentiality order, which garnishees offered to discuss.

By letter the next day, with a hand delivered copy to Judge Pines, counsel for the City said that garnishees "openly defy the Court and seek to delay production unilaterally." The City took the position that garnishees had been "ordered to produce the documents—period—and [the City would] not

---

19. On August 25, 1994, the City again had moved for sanctions. That motion alleged, *inter alia*, that garnishees "have failed to provide substantive answers to interrogatories...." Thirty-six exhibits were attached to that motion, but those exhibits did not include the garnishees' answers to the City's second set of interrogatories, although answers to the first and third sets were included.

indulge [garnishees] at this point in negotiating protective orders."

Also on August 23 garnishees wrote to Judge Pines, care of a person whom we assume was monitoring the mail for him. Garnishees took the liberty of enclosing a draft of a confidentiality agreement. Garnishees also advised that they were not making copies for the City of documents selected by the City at the inspection on August 22 and 23, pending either an interim confidentiality agreement or the court's ruling.

A letter from garnishees to the City of August 26, with copy to Judge Pines, confirmed what garnishees had produced on August 22 and 23. There is more correspondence in the record on appeal between the parties in late August of 1994, concerning the unresolved issue of confidentiality, copies of which were sent to the court.

The default judgment opinion of November 1 leaves no doubt that the immediate, precipitating cause of the default sanction was the appearance on the scene of the other policyholders. One of the first of the garnishees' other policyholders to react to garnishees' notice was Ohio Valley Insulation Co. (Ohio Valley) which, on August 26, moved to intervene and for a protective order. Ohio Valley was the defendant in approximately 7,000 asbestos cases pending in West Virginia (each of which seemingly would have been a subfile of the Ohio Valley account at the Envision claims office). Counsel for Ohio Valley made affidavit that twenty to thirty percent of the content of the respective files for these 7,000 claims was correspondence with assigned counsel. Ohio Valley was fearful that, absent a protective order, information from its insurance files would be disseminated to the asbestos plaintiffs' bar.

Another ramification of the order to produce documents concerning other insureds is illustrated by the motion filed on August 30 by Armstrong World Industries, Inc. (Armstrong). Armstrong had been one of the more than fifty defendants sued by the City in the original action in which Asbestospray had been joined. Armstrong had settled. Part of the agreement of settlement had bound the City to keep the terms of

the settlement confidential. Among the insurers that had contracted to supply various insurances to Armstrong were the garnishees. While Armstrong disclaimed any belief that it was the court's or the City's intent to circumvent the settlement agreement, Armstrong sought a protective order.

Pittsburgh Corning Corporation and PPG Industries also moved for protective orders. They asserted that they would be prejudiced in the ongoing defense of asbestos-related litigation if their defense analyses, defense strategies, and settlement strategies, either in general or in specific cases, were disclosed to plaintiffs' counsel.

On September 7 the court held a telephone conference hearing with counsel for the parties to the garnishment and with an experienced asbestos defense litigator. The latter had alerted the court that he represented thirteen or fourteen other insureds of the garnishees. who intended to intervene but who had agreed to withhold filings for two weeks. The City advised the court that it was willing to have entered "a confidentiality order with respect to those documents that were properly confidential," but asserted that the garnishees had sought to extend the concept to every document produced, including the garnishees' own in-house documents, without regard to confidentiality. The court advised that it had been contacted by yet another attorney for an insured, and the court had promised that attorney that no definitive action would be taken that day.

At that hearing, counsel for the City made the following suggestion:

"Your Honor, perhaps we can deal with the issue of the sanctions and motion for default judgment first, because if that's granted, then all these other people who are now involved in this litigation ... their complaints are moot. . . .

"THE COURT: I agree, but I can't do that until at least the thirteenth [the date for hearing on the City's motion for sanctions]."

At a telephone conference and hearing on September 8, the court signed an order postponing consideration of garnishees'

motion for summary judgment on the policy exclusion construction issue until thirty days "after receipt from Garnishees of all discovery previously requested by Plaintiff and ordered by this court to be produced." At that time the court inquired of the garnishees:

"[D]id I state somewhere that the material should be gathered from wherever it has to be gathered and put in some pile somewhere where we can see what we are talking about?"

When garnishees agreed with the City that the court had directed assembly in Baltimore, the court stated:

"Well, I wanted to see what quantity of documents we are dealing with or what kind of documents we are dealing with, but I think the discovery should be answered.

"And any failure should be addressed with some good reason why it is not available or where it could be seen or could be available."

Following the September 13 hearing on the sanctions motion Judge Pines was out of the country from September 15 to October 15. On October 18 garnishees hand delivered to the court a letter reviewing, from their perspective, the outstanding discovery issues and the mounting volume of discovery. Garnishees

"respectfully urge[d] this Court (a) to transfer the pending and future discovery issues in this case to a Special Master . . . or (b) to transfer those issues to another Circuit Court Judge (anywhere within the state system if necessary), together with all prior proceedings and directives of the Court, to commit the time and analysis necessary to accomplish the decision-making that is necessary on discovery in this case at this time. We would propose the usual procedure of plaintiff and defendants sharing the expenses, half and half."

On November 1 the court entered the default judgment, stating in part that "[g]arnishees' recalcitrant behavior is typified by their soliciting the intervention of policyholders in an effort to forestall production of documents . . . ."

Once the court went down the path of ordering assembly/production of the records of other insureds, garnishees were entitled to a ruling on confidentiality. The court could have broken the impasse, without agreement of the parties, by an order imposing what the court considered to be appropriate restrictions on use of the information obtained. See Maryland Rule 2–401(b) and (g). Instead, the court held out the promise of a confidentiality determination while ordering assembly/production to be accomplished in a short period of time without making any interim confidentiality provision.

Basically, the order to assemble/produce conflicted with the promise appropriately to rule on confidentiality. This left garnishees going in two directions at once. Garnishees timely produced the documents that did not impact other policyholders. They pursued review of other insureds' files. They sought a court ruling. They alerted other insureds to protect themselves. But, while garnishees waited for the court to break the impasse, they did not produce other insureds' information.

If we treat the directive to put the other insureds' documents in a pile on a table in Baltimore as an order to produce, it was defective. The court abused its discretion in entering what we will consider to be an order to produce documents to the City, without having addressed confidentiality concerns. The effect of that error was multiplied by the period of unresolved impasse while the judge was out of the country and by the clamor of actual and potential intervenors who, as they had a procedural right to do, sought to protect their interests. Garnishees should not be punished for the repercussions of confidentiality's having been left unaddressed.

## V

■ The November 1 opinion also mentioned that "several responses are still outstanding with respect to the Plaintiff's third request for production of documents." The City's third request for production of documents, and not simply the notice of service of that discovery material, had been filed July 25,

1994. Garnishees served their answers on the City, and filed their notice of service with the clerk, on August 19. Those answers, after preserving general objections, responded straightforwardly to some of the requests, invited the City to look for themselves as to the request for "[a]ny files maintained on 'asbestos' for the years 1965–1980," and objected as to other requests, including the controversial area of reinsurance of other insureds. The City did not file any motion to compel, but it attached the garnishees' answers as an exhibit to the City's motion for sanctions filed on August 25.

Absent an order compelling discovery under Maryland Rule 2–432(b), the court could not utilize garnishees' answers to the third round of discovery as a basis for sanctions under Maryland Rule 2–433(b) and (c).

### VI

For all of the foregoing reasons, the judgments, enumerated below, imposing sanctions for discovery violations are vacated:

Final judgment dated January 12, 1995, and docketed January 13, 1995, in favor of the City against garnishees in the sum of $10,351,412.44, with interest from January 12, 1995; and

Judgment dated April 21, 1995, and docketed April 26, 1995, against all of the appellants, *i.e.*, garnishees and their counsel, in favor of the City in the sum of $335,981.66.

We also vacate the order of default of November 1, 1994, and we remand for further proceedings.

We point out, however, that vacating the order of default and the money judgments is not an appellate approval of all that garnishees did or did not do in responding to requested discovery. Our mandate does not bar sanctions under Maryland Rule 2–433(b) and (c) that are proportionate to violations of enforceable orders to compel that antedate our mandate. *See Lakewood Eng'g & Mfg. Co. v. Quinn,* 91 Md.App. 375, 604 A.2d 535, *cert. denied,* 327 Md. 524, 610 A.2d 797 (1992). Further, our mandate is not a bar to the imposition of sanctions under Maryland Rule 1–341 should the court appro-

priately conclude that one or more defenses asserted by garnishees are without substantial justification.

Further, garnishees' motion to strike the City's brief is denied.

*JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE CITY VACATED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE, MAYOR AND CITY COUNCIL OF BALTI-MORE.*

RAKER, Judge, concurring.

I agree that the trial court "abused its discretion in entering what we will consider to be an order to produce documents to the City, without having addressed confidentiality concerns." Maj. slip op. at 79. For this reason, I concur in the judgment of the court, but only join in Part IV of the opinion.

BELL, Judge, dissenting.

Rather than the meaning and application of the Maryland discovery rules, at issue on this appeal are the facts of the case and the proper interpretation of the opinion filed by the Circuit Court for Baltimore City in conjunction with the default judgment it entered against the garnishees, North River Insurance Company and United States Fire Insurance Company. Although recognizing that "determining whether sanctions should be imposed, and if so, determining what sanction is appropriate involves a very broad discretion that is to be exercised by the trial courts, "which will be disturbed on appellate review only if there is an abuse of discretion," *North River Insurance Co. v. Mayor and City Council of Baltimore,* 343 Md. 34, 47, 680 A.2d 480, 487 (1996), the majority proceeds to construe the trial court's opinion strictly. Indeed, the only matters it considers as being properly available and usable in support of that decision are those that the opinion specifically mentions; it refuses to consider even those arguments the City made to the trial court in support of the default judgment on the theory that, to do otherwise would be to itself exercise

the discretion reserved to the trial court. *Id.* I do not so narrowly view the trial court's opinion. In fact, I take the trial court at its word, as I believe the law requires appellate courts to do.

The reason the trial court granted the City's motion for default judgment is quite clear. It was because the court construed the garnishees' "failure of discovery [to amount] to a 'stall,'" to be the result of their effort to delay or avoid providing discovery. That is made obvious by the court's observations, under the "Discussion" section of its opinion, that the garnishees had, "to date failed to provide the City with some 18 answers to [the City's first set of] interrogatories" and that "[w]hen this court directed Garnishees to produce withheld documents for *in camera* review, a substantial number of documents were not included in the material produced." Confirmation is found in its comments concerning the garnishees' response to the City's second and third sets of discovery:

> The City filed a second set of discovery to which Garnishees responded by moving for a protective order. Garnishees' motion was denied, as was their motion for reconsideration of that denial. Rather than answer interrogatories and produce documents requested, Garnishees informed hundreds of their policyholders that documents were being sought in the instant litigation; the effect of this was to invite further motions for protective orders. Additionally, several responses are still out-standing with respect to the Plaintiff's third request for production of documents.

If that were not enough, the court's concluding paragraph leaves absolutely no doubt:

> *It is clear that despite repeated efforts by this court to resolve disputes and facilitate discovery, Garnishees are more interested in slowing the proceedings than defending their case. Garnishees's recalcitrant behavior is typified by their soliciting the intervention of policyholders in an effort to forestall production of documents*—after Garnishees' two failed attempts to obtain protective orders. Furthermore,

Plaintiff's Motion for Sanctions has been held *sub curia* for well over a month without any further production by Garnishees. (Emphasis added; footnote deleted).[1]

While purporting to give the trial court the appropriate deference with respect to discovery rulings, its narrow interpretation of the opinion enables the majority to achieve a result it finds more acceptable. In so doing, however, it severely undercuts the trial court's ability definitively and effectively to administer and control discovery, as the Maryland Rules contemplate.

The rules governing discovery in civil cases in the circuit courts of this State are codified in Title 2, Chapter 400 of the Maryland Rules of Practice and Procedure. They are comprehensive and they are well-conceived, having been developed and refined over many years. It is well settled that one of the fundamental and principal objectives of the discovery rules is to require a party litigant fully to disclose all of the facts to all adversaries and, thereby, eliminate, as far as possible, the necessity of any party to litigation going to trial in a confused or muddled state of mind concerning the facts that gave rise to the litigation. *See Berrain* v. *Katzen*, 331 Md. 693, 697, 629 A.2d 707, 708 (1993); *Androutsos v. Fairfax Hospital*, 323 Md. 634, 638, 594 A.2d 574, 576 (1991); *Public Service Comm'n v. Patuxent Valley Conservation League*, 300 Md. 200, 216, 477 A.2d 759, 767 (1984); *Kelch v. Mass Transit Administration*, 287 Md. 223, 229–30, 411 A.2d 449, 453 (1980); *Klein v. Weiss*, 284 Md. 36, 55, 395 A.2d 126, 137 (1978); *Mason v. Wolfing*, 265 Md. 234, 236, 288 A.2d 880, 881 (1972); *Williams v. Moran*, 248 Md. 279, 291, 236 A.2d 274, 281–82 (1967); *Pfeiffer v. State Farm Mut. Auto. Ins. Co.*, 247 Md. 56, 60–61, 230 A.2d 87, 90 (1967); *Caton Ridge, Inc. v. Bonnett*, 245 Md. 268,

---

1. The footnote commented on a theme that the garnishees have consistently sounded throughout these proceedings—that the trial court did not "order" the discovery for the failure of which they were sanctioned, rather it simply "directed" or "suggested" that certain steps be taken or information disclosed. Needless to say, I agree entirely, and I believe even a cursory reading of the record will confirm, that the court passed discovery "orders," which it expected the garnishees to obey.

276, 225 A.2d 853, 857 (1967); *Miller v. Talbott,* 239 Md. 382, 387–88, 211 A.2d 741, 744–45 (1965); *Guerriero v. Friendly Finance Corp.,* 230 Md. 217, 222–23, 186 A.2d 881, 884 (1962). It is not surprising, therefore, "that they are broad and comprehensive in scope, and were deliberately designed to be so." *Balto. Transit v. Mezzanotti,* 227 Md. 8, 13, 174 A.2d 768, 771 (1961). *See* Maryland Rule 2–402(a), which provides:

Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(a) Generally.—A party may obtain discovery regarding any matter, not privileged, including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter, if the matter sought is relevant to the subject matter involved in the action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party. It is not ground for objection that the information sought is already known to or otherwise obtainable by the party seeking discovery or that the information will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence. An interrogatory or deposition question otherwise proper is not objectionable merely because the response involves an opinion or contention that relates to fact or the application of law to fact.

Pertinent to this case, subsection (b) makes specifically discoverable "any insurance agreement under which any person carrying on an insurance business might be liable to satisfy part or all of a judgment that might be entered in the action or to indemnify or reimburse for payments made to satisfy the judgment."

Moreover, because "the sound and expeditious administration of justice" is served when all parties are aware of and acknowledge all "relevant, pertinent, and non-privileged facts, or the knowledge of the whereabouts of such facts" and are able thereby to prepare their cases properly and efficiently,

the discovery rules are intended to be liberally construed. *Mezzanotti*, 227 Md. at 13, 174 A.2d at 771. But the existence of comprehensive discovery rules is essentially meaningless without some enforcement mechanism. Therefore, our discovery scheme has incorporated a rule, 2–433, prescribing sanctions for non-compliance. Providing, as relevant:

(a) For Certain Failures of Discovery.—Upon a motion filed under Rule 2–432(a), the court, if it finds a failure of discovery, may enter such orders in regard to the failure as are just, including one or more of the following:

(1) An order that the matters sought to be discovered, or any other designated facts shall be taken to be established for the purpose of the action in accordance with the claim of the party obtaining the order;

(2) An order refusing to allow the failing party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence; or

(3) An order striking out pleadings or parts thereof, or staying further proceeding until the discovery is provided, or dismissing the action or any part thereof, or entering a judgment by default that includes a determination as to liability and all relief sought by the moving party against the failing party if the court is satisfied that it has personal jurisdiction over that party. If, in order to enable the court to enter default judgment, it is necessary to take an account or to determine the amount of damages or to establish the truth of any averment by evidence or to make an investigation of any matter, the court may rely on affidavits, conduct hearings or order references as appropriate, and, if requested, shall preserve to the plaintiff the right of trial by jury.

Instead of any order or in addition thereto, the court, after opportunity for hearing, shall require the failing party or the attorney advising the failure to act or both of them to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the court finds that the

failure was substantially justified or that other circumstances make an award of expenses unjust.

(b) For Failure to Comply with Order Compelling Discovery.—If a person fails to obey an order compelling discovery, the court, upon motion of a party and reasonable notice to other parties and all persons affected, may enter such orders in regard to the failure as are just, including one or more of the orders set forth in section (a) of this Rule. If justice cannot otherwise be achieved, the court may enter an order in compliance with Rule P4 treating the failure to obey the order as a contempt,

this Court has commented, *albeit* referring to a predecessor rule, that the prescribed sanctions are also comprehensive and adequate to insure that the parties to litigation comply with the discovery rules. *See Kelch,* 287 Md. at 229, 411 A.2d at 453; *Klein,* 284 Md. at 55, 395 A.2d at 137; *Broadwater v. Arch,* 267 Md. 329, 335–36, 297 A.2d 671, 674 (1972).

In that regard, the primary focus of the discovery scheme—the critical actor in the resolution of discovery disputes—is the trial judge. *Mezzanotti,* 227 Md. at 13–14, 174 A.2d at 771. It is the trial judge to whom is entrusted the responsibility of administering the discovery rules and in whom is vested a large measure of discretion, to be exercised soundly and reasonably, in applying sanctions for failure to adhere to those rules. *Id.* The court's exercise of its discretion in that regard will not be disturbed on appeal in the absence of a clear showing that it was abused. This is true even when the court imposes the ultimate sanction, dismissal of the case or the entry of a default judgment. *Broadwater,* 267 Md. at 336, 297 A.2d at 674; *Mason,* 265 Md. at 236–37, 288 A.2d at 882; *Evans v. Howard,* 256 Md. 155, 161, 259 A.2d 528, 531 (1969); *Lynch v. R.E. Tull & Sons, Inc.,* 251 Md. 260, 261, 247 A.2d 286, 287 (1968); *Pappalardo v. Lloyd,* 250 Md. 121, 124, 242 A.2d 145, 147 (1968); *Pfeiffer v. State Farm,* 247 Md. 56, 60–61, 230 A.2d 87, 90 (1967); *Peck v. Toronto,* 246 Md. 268, 270, 228 A.2d 252, 254 (1967), *cert. denied,* 389 U.S. 868, 88 S.Ct. 139, 19 L.Ed.2d 142 (1967); *Miller,* 239 Md. at 388, 211 A.2d

at 745; *Guerriero,* 230 Md. at 221, 186 A.2d at 883; *Mezzanotti,* 227 Md. at 20–21, 174 A.2d at 775.

Historically, the rule had been that a default judgment was properly entered only when the failure of discovery was willful or contumacious. *Lynch,* 251 Md. at 261, 247 A.2d at 287 (citing *Peck,* 246 Md. at 270, 228 A.2d at 254)); *Smith v. Potomac Electric Power Co.,* 236 Md. 51, 62, 202 A.2d 604, 610 (1964). That no longer is the case. It is now well-settled that, consistent with the notion that the decision to impose sanctions is within its sound discretion, the power of trial courts to impose sanctions is not dependent upon any requirement that they find that the defaulting party acted willfully or contumaciously. *Lynch,* 251 Md. at 261, 247 A.2d at 287; *Billman v. State of Maryland Deposit Insurance Fund Corporation, et al.,* 86 Md.App. 1, 12, 585 A.2d 238, 243–44 (1991); *State Farm Mutual Automobile Insurance Company v. Schlossberg,* 82 Md.App. 45, 61, 570 A.2d 328, 336 (1990), *cert. denied,* 320 Md. 222, 577 A.2d 50 (1991); *Berkson v. Berryman,* 63 Md.App. 134, 142, 492 A.2d 338, 342–43 (1985); *Rubin v. Gray,* 35 Md.App. 399, 400 370 A.2d 600, 601 (1977). A trial court that imposes the ultimate sanction does not necessarily abuse its discretion even though other, less severe or burdensome alternatives may have been available. As the Court Of Special Appeals observed in *Rubin, supra,* "[t]he authority to impose this 'gravest of sanctions' ... is not limited to wilful or contemptuous failures to answer [interrogatories], but may be imposed for a deliberate attempt to hinder or prevent effective presentation of defenses or counterclaims, or for stalling in revealing one's own weak claim or defense." 35 Md.App. at 400, 370 A.2d at 601.

Judicial discretion was defined in *Saltzgaver v. Saltzgaver,* 182 Md. 624, 635, 35 A.2d 810, 815 (1944) (quoting *Bowers' Judicial Discretion of Trial Courts* par. 10) as "that power of decision exercised to the necessary end of awarding justice and based upon reason and law, but for which decision there is no special governing statute or rule." Further commenting on its nature, the Court stated

"it is obvious that if a special statute prescribed a decision, there is, in all instances coming within its purview, a restraint upon the judge which precludes the exercise of a discretion by him; for the very word 'discretion' implies the absence of restraint. This statement is only apparently at variance with the oft-quoted statement of Lord Mansfield that: 'Discretion, when applied by a court of justice, means sound discretion guided by law.' "

*Id.*

Maryland Rule 2–433 does "govern" the situation in which the trial court decides to sanction a party for failing to disclose discoverable information; however, it does not, nor does it purport to, do more than to provide the court with various options that are available to it. Indeed, when faced with the various alternative sanctions prescribed and the task of selecting the "appropriate" one, a trial court clearly is required to consider every aspect of the case before choosing a remedy. In other words, consideration of the facts and circumstances unique to the case under review, along with the various available options, do not preordain a *single* required, or even permissible, result; there is no hard and fast rule. Discretion thus signifies choice and choice is the very antithesis of a hard and fast rule.

Necessarily, when there is no hard and fast rule governing the situation, in arriving at a decision, the trial judge must exercise his or her judicial discretion. The decision he or she makes, in turn, is reviewed for the soundness and reasonableness with which the discretion was exercised. In making that evaluation, the reviewing court must defer to the trial court. The necessity for doing so is inherent in the very nature of judicial discretion. The exercise of judicial discretion ordinarily involves making a series of judgment calls, not simply the ultimate one, but also those on which the ultimate one depends. Where it is alleged that there has been a failure of discovery, in exercising its discretion and as a predicate to determining the propriety of imposing a sanction and, if so, which one, the trial court must find facts. Until it has determined what the significance of the offending party's

actions is and their impact under the circumstances, the court is not in a position to make any decision concerning sanctions. Because it will not have defined, and, so, will not have explored the available choices, the court simply could not exercise any discretion.

We have long recognized in this State, consistent with the weight of authority throughout this country, *see, e.g., Fletcher v. Fletcher,* 447 Mich. 871, 526 N.W.2d 889, 897 n. 11 (1994); *Nixon v. Blackwell,* 626 A.2d 1366, 1378 (Del.1993); *People v. Cox,* 53 Cal.3d 618, 280 Cal.Rptr. 692, 809 P.2d 351, 364 (1991); *Speed v. DeLibero,* 215 Conn. 308, 575 A.2d 1021, 1024 (1990); *Dixon v. U.S.,* 565 A.2d 72 (D.C.1989), that the trial court is in the best position to make findings of fact. Therefore, this Court has consistently held that the findings of fact made by trial courts are entitled to great deference. *E.g., Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240 (1990); *McAvoy v. State,* 314 Md. 509, 514–15, 551 A.2d 875, 877 (1989); *In Re Anthony F,* 293 Md. 146, 152, 442 A.2d 975, 979 (1982); *Parker v. State,* 66 Md.App. 1, 10–11, 502 A.2d 510, 515, *cert. denied,* 306 Md. 70, 507 A.2d 184 (1986). Not only will the trial court have seen and heard the testimony, where appropriate, or the arguments or explanations of counsel, as in this case, important considerations in fact-finding, certainly, *see* Maryland Rule 8–131(c)[2], but it will have lived with the case for a period of time, in the process getting to know the issues, counsel, and, sometimes, the parties, up close and personal. Except that its focus is on whether the trial court in that case abused its discretion when it denied a motion for mistrial, what I said, in dissent, in *Medical Mutual Liab. Ins. Soc'y v. Evans,* 330 Md. 1, 34–35, 622 A.2d 103, 119 (1993) (Bell, J., dissenting), is most pertinent:

Additionally, a judge's presence at the trial, conducting it, with his or her "finger on the pulse" of the situation, *Brooks*

---

2. Maryland Rule 8–131(c) provides:
 (c) Action Tried Without a Jury.—When an action has been tried without a jury, the appellate court will review the case on both the

[*v. Daley* ], 242 Md. [185], 197, 218 A.2d [184], 191 [ (1965) ], renders him or her the logical and, indeed, the best person to evaluate the existence of prejudice. [*State v.*] *Hawkins,* 326 Md. [270], 278, 604 A.2d [489], 493 [ (1992) ]. Having lived with the case, the trial judge views the situation in three dimension, up close and personal, not from a cold record; thus, having closely observed the entire trial, he or she is able to appreciate "nuances, inflections and impressions never to be gained from a cold record," *Buck v. Cam's Broadloom Rugs, Inc.,* 328 Md. 51, 59, 612 A.2d 1294, 1298 (1992), not to mention being able to assess, firsthand, the demeanor of the witnesses as well as the reaction of the jurors and counsel to those witnesses and to the evidence as it is adduced.

I recognize that in a discovery situation, it may be the court's assessment or perception of the circumstances, rather than, in a strict sense, its fact-finding that is critical. Nevertheless, as in a trial, with respect to fact finding, in the discovery situation where the court may not be required to make explicit findings of fact, the court's assessment or perception of the circumstances surrounding an alleged discovery violation is intimately intertwined with the court's exercise of discretion. Consequently, the same deference accorded the trial court's fact-findings in a trial must be given the trial court's assessment of the circumstance surrounding a discovery situation. Of course, when the court makes findings of fact, implicitly or explicitly, concerning discovery, the situations are identical.

Moreover, as is the case with respect to the conduct of a trial, including admission of evidence, *Crawford v. State,* 285 Md. 431, 451, 404 A.2d 244, 254 (1979), the conduct of discovery proceedings, including holding hearings on motions to compel discovery or to sanction discovery violations, is direct-

---

law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

ed to the considerable discretion of the trial court. In that regard, and clearly relevant to whether there has been an abuse of discretion is a proposition that is of some considerable significance in our jurisprudence, *State v. Babb,* 258 Md. 547, 550, 267 A.2d 190, 192 (1970), that judges are presumed to be "men [and women] of discernment, learned and experienced in the law and capable of evaluating the materiality of evidence." *Id.* They are presumed, furthermore, to know the law and lawfully and correctly to apply it. *Smith v. State,* 306 Md. 1, 7–8, 506 A.2d 1165, 1168 (1986) (citing *Hebb v. State,* 31 Md.App. 493, 499, 356 A.2d 583, 587 (1976)).

In this case, we are not left to speculate with regard to how the trial court assessed or perceived the circumstances surrounding the various failures of discovery that the City alleged. The record is quite clear in that regard—the court believed and, therefore, found that the garnishees were engaged in a stall, that they were intent upon avoiding, or, if that were not possible, in delaying as long as possible the disclosure of requested information. That is the sum and substance of the court's opinion. Indeed, in that opinion, there is a statement that says almost precisely that. As we have seen, the court wrote: "It is clear that despite repeated efforts to resolve disputes and facilitate discovery, Garnishees are more interested in slowing the proceedings than defending their case." Moreover, the court cited *Rubin v. Gray, supra,* for the proposition that a default judgment is an appropriate sanction for stalling discovery. At the same time, the court did not purport to enumerate exhaustively the bases for that conclusion; it simply sought to provide examples. Thus, the court spoke of conduct that "typified" the "recalcitrant behavior". There simply is nothing in the trial court's opinion to suggest, or that could be read as indicating, that only that conduct of the garnishees to which the opinion explicitly referred, constituted the sole basis for its decision. What comes through clearly and forcefully when the opinion is read objectively, even if not deferentially, is that the court found the garnishees to be engaging in dilatory conduct for the purpose of "stalling" discovery.

Significantly, the court's opinion does not rely on any particular failure of discovery as being dispositive of the City's entitlement to a default judgment. That no particular failure of discovery was relied upon is confirmed by the record. The transcript of each of the proceedings at which the issue of the garnishees' failure or delay of discovery was raised, the City detailed, and urged the court to consider, as a basis for granting the requested relief, each and every instance in which such a failure or delay had occurred. The City relied on instances when the discovery was supplied late; arguing that it was not enough that discovery had eventually been made late, its timing, the City argued, was also important. Timing was also important to the court, as is evident from the manner in which it viewed the "61 missing pages." Although it is clear that they were eventually supplied,[3] when they were

---

**3.** The majority states that its tracing of the 61 missing documents revealed that some of them, including the McHugh memorandum of November 7, 1983, upon which the City placed heavy reliance as critically affecting the garnishees' defenses, had been timely submitted—that it "was in the box of claimed privileged documents delivered ... in July 1994 and was erroneously considered to be a 'missing' document, leading to the delivery of a second copy by OKG & S's paralegal in September 1994, with the result that the City introduced both copies into evidence in January 1995." 343 Md. 34, 59, 680 A.2d 480, 492 (1996). My review of the parts of the record on which the majority relies leads me to conclude that the only thing clear about those parts of the record is that they are at best ambiguous. The trial judge, on the other hand, clearly and unambiguously stated that he found those pages missing. I believe that we must infer from his statement that he reviewed the documents submitted to him. Furthermore, that the documents were missing was confirmed by a law clerk, who, it seems logically also would have checked. Under these circumstances, it simply is not appropriate to disbelieve the trial judge, on the basis of an ambiguous record. Moreover, to do so is to fail to give the trial judge the deference to which he is entitled.

Nor am I persuaded by the majority's observation that the trial court "made no finding that the description [of those pages of which the McHugh memorandum was a part] in the privilege log, considered in and of itself, was intended to deceive," *id.*, or its explanation as to why the description was not misleading. First, the trial court was not required to make such an explicit finding; it is enough if it makes an implicit one. From the totality of the circumstances, it is clear that to make an implicit finding that the description was misleading is precisely what the court did. The court need not, and, indeed, apparently did

supplied was critical to the court's analysis; their not having been supplied when ordered was further evidence to the court of the garnishees' dilatoriness.

There is ample support in the record for the court's findings and conclusions. As previously indicated, the court had lived with this case, was intimately acquainted with the discovery issues, with which it had frequently and painstakingly dealt, and had more than a passing acquaintance with counsel, who had themselves been active participants in the process since the garnishment action had been instituted, some even longer. Consequently the court had its finger on the pulse of the case, being able to see and hear counsel as they argued their respective positions; it was in the best position of anyone to assess the progress of discovery and the sincerity with which it was being conducted. It is obvious, given the judgment it rendered, the opinion it filed, and the comments it made at the various hearings, especially those after July 1994, that the court did not believe that the garnishees were sincerely engaged in discovery. And I do not believe that there is any basis on which this Court can conclude that the trial court abused its discretion in that regard.

The majority asserts that " '[a] right for the wrong reason' rationale does not apply to the imposition of discovery sanctions as presented in the instant matter, because that rationale would have the appellate court exercising its discretion in the first instance." *North River Insurance Co.*, 343 Md. at 47, 680 A.2d at 487. I agree, generally, that an appellate court is not required to search the record for reasons to uphold the trial court's decision; however, I also believe that we should

---

not, accept that the mislabeling was inadvertent. It was free to, and I submit, did, accept the City's concealment argument. Second, from the fact that the description was not entirely accurate and, in fact, with respect to the McHugh memorandum, was totally inaccurate, it is neither surprising nor illogical that one would argue, or that the court would accept, that the purpose of so labeling the documents was to deceive.

Finally, the majority rejects the trial court's conclusion that the 61 missing pages were relevant. In so doing, it once again fails to defer to the discretion of the trial court, substituting its judgment instead.

fairly and accurately evaluate the trial court's exercise of discretion. We cannot do that if we fail to read the court's opinion accurately. When the language and the context of the opinion do not indicate that it should be so construed, we should not view the court's opinion as setting forth every reason on which it relied for its determination that the garnishees' actions evidenced an intent to frustrate the discovery process. It is a well-settled principle of law that "trial judges are not obliged to spell out in words every thought and step of logic." *Beales v. State,* 329 Md. 263, 273, 619 A.2d 105, 110 (1993); *See also Jackson v. State,* 340 Md. 705, 717, 668 A.2d 8, 14 (1995); *Whittlesey v. State,* 340 Md. 30, 48, 665 A.2d 223, 230 (1995); *Coviello v. Coviello,* 91 Md.App. 638, 659, 605 A.2d 661, 671 (1992); *Campolattaro v. Campolattaro,* 66 Md.App. 68, 77, 502 A.2d 1068, 1073 (1986); *Kirsner v. Edelmann,* 65 Md.App. 185, 196 n. 9, 499 A.2d 1313, 1319 n. 9 (1985) ("[A] judge is presumed to know the law, and thus is not required to set out in intimate detail each and every step of his or her thought process."); *Zorich v. Zorich,* 63 Md.App. 710, 717, 493 A.2d 1096, 1099 (1985) ("Because trial judges are presumed to know the law, (citation omitted), not every step in their thought process needs to be explicitly spelled out."); *Bangs v. Bangs,* 59 Md.App. 350, 370, 475 A.2d 1214, 1224 (1984) ("A chancellor is not required to articulate every step in his thought processes.").

With this caveat regarding the exercise of judicial discretion in mind, our review of the bases for the trial court's discovery decisions should encompass not only those reasons the court set forth in its opinion, but also all of the other reasons that may appear in the record, which, given the circumstances, may have contributed to the court's determination on that issue; support for the court's decision should not be sought only from the four corners of the court's opinion where, as here, the court did not purport to so limit the reasons for its decision.[4]

---

4. As the majority sees it, matters not mentioned in the trial court's opinion were not matters on which the trial court relied in deciding to sanction the garnishees. I have previously expressed my disagreement

Thus, the incidents which the City alleged evidenced garnishees' intent to stall discovery, including those relating to the scheduling of the depositions of some of the garnishees' employees or witnesses,[5] should have been considered. The record of the discovery proceedings reflects that the court addressed the discovery issues as they arose. The City not only apprised the court of the problems, but it offered them as bases for sanctioning the garnishees. The court was also aware of each time that the garnishees failed to furnish discovery after they had been ordered to do so. In addition, it certainly knew the reasons the garnishees gave for those

---

with that approach; it is much too narrow a reading of the court's opinion. More to the point, however, it is a total disregard of the plain words of that opinion. It could not be clearer that the court was concerned with the garnishees' dilatoriness. An effective means of delaying disclosure of discoverable information is to delay already scheduled depositions. The City asked the court, in argument, so to interpret the garnishees' actions in that regard. Giving appropriate deference to the court's decision and, since judges are presumed to know and correctly apply the law, we must assume that the court accepted its argument.

5. Even though they are not expressly set forth in the trial court's discovery opinion as one of the bases for its imposition of sanctions against the garnishees, the specific assertions, regarding the garnishees' deposition misconduct which call into question whether the garnishees complied with discovery in good faith are set forth in the City's Motion for Sanctions, filed August 27, 1994. Specifically, Mr. Bowley, an Environmental Claims Supervisor, was initially scheduled for deposition on a specified date. Shortly before that date, the deposition was cancelled by the garnishees because of his alleged unavailability. At his rescheduled deposition, however, Bowley stated that he had been available on the preceding date. Corporate designee Roger Quigley, similarly was scheduled for deposition, but, just prior to the date agreed upon, it was cancelled because he was very busy. In actuality, as Quigley later testified, he had retired in 1993, and other than testifying once a month for Crum & Foster, had done no other work since that time.

Even though these incidents were not explicitly mentioned in the court's opinion they no doubt were considerations which played a part in the court's decision to impose sanctions against the garnishees. As we have seen, the court was not required to set forth, exhaustively every incident contributing to its decision. Therefore, in this case, this Court must consider not only those reasons set forth in the court's opinion, but also those facts, as can be discerned from the record, upon which the court is presumed to have properly relied.

defaults. It was not required to accept the garnishees' explanations. In fact, the court could have, as it no doubt did, consider the frequency of the failures, along with the similarity of the explanations given to justify them, in deciding what credibility to give them.

In conclusion, there is much in the majority opinion that I find troubling.[6] The biggest problem with it is its approach.

---

**6.** In addition to everything else, the majority substitutes its judgment for that of the trial judge, while purporting and protesting that it is not. I have already mentioned one instance in which this has occurred. *See* note 3. Two other examples further elucidate this point. One of the reasons the majority concludes that the trial court abused its discretion in ordering the phase two discovery was because:

> [T]he requested discovery would be only contingently and marginally relevant under the Maryland law concerning the interpretation of written contracts.... Thus, although the trial court had discretion to allow discovery to proceed before deciding whether the policy language was ambiguous, proceeding in that fashion was inefficient. If the court decided that the exclusion was facially ambiguous, and if garnishees sought to prove lack of ambiguity factually, the scope of the City's discovery would have been limited to matters relevant to the facts relied upon by the garnishees.

*North River Ins. Co.*, 343 Md. at 66, 680 A.2d at 496. While recognizing the court's discretion to proceed as it did, the majority nevertheless finds that proceeding in that manner contributed to the court's abuse of discretion. In so doing, it loses sight of a point that is both well settled and elementary: "The discovery contemplated by our rules is designed to permit inquiry into the facts underlying an opponent's case as well as to bolster one's own" *Barnes v. Lednum*, 197 Md. 398, 79 A.2d 520, 524 (1951). Moreover, I am not at all sure that the court did not resolve the ambiguity issue in the City's favor. Certainly, as the City argues, persuasively to me, this Court seems itself to have resolved the issue in its favor also. *See Sullins v. Allstate Ins. Co.*, 340 Md. 503, 667 A.2d 617 (1995).

Another reason offered by the majority for concluding that the trial court abused its discretion in connection with the phase two discovery was the majority's belief that the court "seems to have given almost no weight" to affidavits describing the magnitude of the search, which the majority determined to be reasonable on their faces. *North River Ins. Co.*, 343 Md. at 66, 680 A.2d at 496. What weight a trial judge gives to evidence is quintessentially within the province of the trial court, not the appellate court. *Brown v. State*, 339 Md. 385, 391, 663 A.2d 583, 589 (1995); *Chambers v. State*, 337 Md. 44, 47, 650 A.2d 727, 728 (1994). "It is not the function or duty of the appellate court to undertake a review of the record that would amount to, in essence, a retrial of the case." *State v. Albrecht*, 336 Md. 475, 479, 649 A.2d 336, 337 (1994). This is just one more example of the majority failing to pay

The majority does not take the trial court at its word. Notwithstanding the court's viewing the case as one deserving of the imposition of a sanction due to intentional and deliberate delay, rather than a complete failure of discovery, the majority inclines toward the latter view. In addition, instead of looking at the totality of the circumstances, as the trial court did, the majority focuses solely on those actions mentioned in the court's opinion and treats each as a separate issue. Rather than according the trial court even a modicum of the deference it deserves, the majority, in effect, does just the opposite. By reading the court's opinion as narrowly as possible, it puts the worst possible face on it. Ordinarily, because of the presumption of knowledge, trial courts are given the benefit of any doubt—only when the record demonstrates that it is not deserved will appellate courts do otherwise. To read an opinion, which on its face does not even imply that it is, not to mention purport to be, an exhaustive list of each fact contributing to its decision and on which it relied, refusing to draw reasonable and logical inferences, is to give the benefit of the doubt to a party, rather than to the judge. That is particularly the case when, as here, the rule pursuant to which the court acted does not require it so meticulously to explain its rationale,[7] and, as we have seen, there are many appellate cases explicitly stating that the court need not specify every step in its reasoning process.

Although the critical feature of this case is not that the garnishees failed completely to comply with discovery orders, the court determined nevertheless that there was a complete failure of discovery with respect to "some 18 answers to interrogatories" propounded in phase one discovery as well as several responses to the phase three request for production of documents. Neither the garnishees nor the majority has adequately refuted that determination. That failure of discov-

proper deference to the trial court's special and superior position from which to assess and decide discovery matters.

7. Neither Maryland Rule 2–432 nor Maryland Rule 2–433 even addresses the manner or form that the court's ruling must take.

ery is, as the City points out, by itself sufficient to sustain the trial court's judgment. *Lynch*, 251 Md. at 261, 247 A.2d at 287; *Mezzanotti*, 227 Md. at 21, 174 A.2d at 775.

Since I do not believe that the trial court abused its decision in entering default judgment in favor of the City, I would affirm the judgment of the Circuit Court for Baltimore City. which it expected the garnishees to obey.